IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

No. 96-8359

D. C. Docket No. CV195-128

BRUCE JAMES POWELL, SR., individually
as Natural Father of BRUCE JAMES POWELL, JR.,
and as Administrator of the Estate of BRUCE
JAMES POWELL, JR.,

Plaintiff-Appellant,

versus

GEORGIA DEPARTMENT OF HUMAN RESOURCES,
JAMES G. LEDBETTER, individually and as
the Commissioner of the Department of
Human Resources of the State of Georgia,
DOUG GREENWELL, individually and as Director
of the Department of Human Resources of the
State of Georgia Division of Family and Children
Services, PAT FITZGERALD, individually and as
the Director of the County Department of Family
and Children Services, MIGNON ROSEN, individually
and as an employee of the Richmond County
Department of Family and Children Services, JANE
DOE, a DFCS Caseworker known and identified with the
initials M.D.S., individually and as an employee of
the Richmond County Department of Family and
Children Services,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Georgia

**(May 29, 1997)**

Before ANDERSON, Circuit Judge, and FAY and KRAVITCH, Senior
Circuit Judges.

ANDERSON, Circuit Judge:

Appellant Bruce James Powell, Sr., appeals the district court's order dismissing his complaint for failure to state a claim upon which relief can be granted.  We affirm.

## I.  FACTS[1] AND PROCEDURAL HISTORY

This case involves the tragic death of Powell's infant son.  Powell's son, Bruce James Powell, Jr., was born on April 26, 1993.  Approximately one month after the baby's birth, Powell, age 18, and the baby's mother, age 15, ended their relationship.  The mother retained primary physical custody of the baby, with Powell exercising visitation rights.  On

---

[1] Because we are reviewing the district court's dismissal of Powell's complaint for failure to state a claim, we accept the factual allegations of the complaint as true, construe them in the light most favorable to Powell, and determine whether it appears beyond doubt that Powell can prove no facts that would entitle him to relief.  Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957); Welch v. Laney, 57 F.3d 1004, 1008 (11th Cir. 1995).

2

July 22, 1993, the mother married James Loren, age 20.

On August 29, 1993, the baby's maternal grandmother, Janice Newman, took the baby to the home of the baby's maternal great aunt, Jeannette Odum. Odum noticed bruises on the baby, became concerned, and took the baby to Powell's workplace to show him the baby's bruises. At Powell's request, Odum called the Richmond County Department of Family and Children Services ("DFCS") and reported that she suspected the baby was being abused.

Appellee Mignon Rosen, a DFCS caseworker, met Powell and Odum at Powell's workplace and examined the baby. Rosen noticed that the baby had a scrape across his forehead, discoloration over his left ear with slight swelling, broken blood vessels in his right ear, and three bruises on the back of his thigh. She noted these injuries in her initial report. Rosen was informed that the baby's mother was very young and immature and that Loren, the baby's stepfather, was a heavy drinker who handled the baby roughly.

Rosen contacted her supervisor at DFCS, who advised Rosen that a doctor should examine the baby. Rosen did not follow this advice and did not have the baby examined by a doctor. Rosen gave Odum protective custody of the baby and promised to speak with the mother and Loren the next day about the baby's situation.

Later that same night, Rosen received a telephone call from Odum. Odum reported that Newman was going to call the sheriff's department and obtain custody of the baby. Rosen told Odum that the baby could be taken into protective custody.

After her conversation with Odum, Rosen called "Ask a Nurse" to inquire about the possible causes of the baby's injuries. Rosen was informed that there was no medical condition that would cause the observed injuries. Rosen then called an emergency shelter and was told that the shelter could house the baby for the night. Rosen, however, took no action to place the baby in the shelter.

The mother and Newman arrived later that night at Odum's home with a deputy sheriff and demanded

the return of the baby.  After learning of Rosen's involvement with the baby's case, the deputy called Rosen to advise her of the situation.  Rosen, acting on the instructions of her supervisor, went to Odum's home.  Discussions occurred in which the mother indicated that Loren had explained the baby's injuries by saying that the baby had fallen off the bed.  Rosen allowed the baby to be released into Newman's custody, although protective custody at the emergency shelter was available.  Rosen instructed Newman that Newman should not return the baby to the mother's custody.

The next day, August 30, 1993, the baby's case was assigned to appellee Jane Doe, an unknown DFCS caseworker with the initials M.D.S.  No action was taken that day on the baby's case.  On August 31, 1993, Jane Doe called Newman, who told Jane Doe that the baby had returned to the mother's home, despite Rosen's instructions to the contrary. During this conversation, Jane Doe learned that the mother and Loren lived with Loren's sister and her boyfriend in an environment of excessive drinking.

Newman, in another telephone conversation with Jane Doe later that same day, also told Jane Doe that she believed that someone who lived in the baby's home had dropped the baby. The mother and Loren failed to meet with Jane Doe that day as scheduled to discuss the baby's care.

Jane Doe took no further action on the baby's case. She made an entry in the baby's file on September 16, 1993 stating: "Another intake. Due to excessive # of intakes and [caseworker] trying to get case load in order to be out on [leave] starting 9/17/93, [caseworker] unable to make another contact."

The baby, who was not yet five months old, died that day. The official cause of the baby's death was "blunt force trauma to the head." For over two weeks prior to his death, the baby had been severely abused and neglected. The baby's injuries included innercranial bleeding, retinal bleeding, abrasions, and over 100 bruises on his body. The baby's treating physicians described the baby's case as one of the worst instances of child abuse they had ever

seen. The mother and Loren were convicted of the baby's murder.

Powell sued the appellees under 42 U.S.C. § 1983, seeking monetary damages and claiming that the appellees violated his son's substantive and procedural due process rights and his son's Eighth Amendment rights. He also alleged a state law claim against the appellees under the Georgia Tort Claims Act. The appellees moved to dismiss Powell's complaint. The district court held pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure that Powell failed to state a federal claim upon which relief can be granted. Consequently, the district court dismissed Powell's federal claims and declined to exercise its jurisdiction over Powell's state law claim.[2]

The only issue before us in this appeal is whether Powell has stated a claim against the individual appellees in their individual capacities. Powell asserts only two claims on appeal: a

---

[2] The district court dismissed the state law claim without prejudice.

substantive due process claim and a procedural due process claim.[3]

## II.  ANALYSIS

Before analyzing Powell's claims, we pause to note that the circumstances alleged by Powell are troubling and tragic.  However, Powell has elected to sue in federal court and thus has undertaken to prove more than merely wrongful acts on the part of the appellees or a constitutional violation; rather, in order to surmount the appellees' qualified immunity shield, Powell must prove that the appellees violated <u>clearly established</u> constitutional rights of which a reasonable person would have known.

Qualified immunity shields government officials performing discretionary duties from civil litigation

---

[3] Powell has not appealed the district court's determination that the Department of Human Resources and the individual appellees in their official capacities are immune from suit under the Eleventh Amendment.  Powell also has not appealed the district court's dismissal of his claim that the appellees violated his son's Eighth Amendment rights.

8

and liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 475 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  We readily conclude in this case that the appellees were performing discretionary duties,[4] and thus the burden shifts to Powell to demonstrate that the appellees violated clearly established constitutional rights of which a reasonable person would have known.  McCoy v. Webster, 47 F.3d 404, 407 (11th Cir. 1995).  As the Supreme Court most recently stated in United States v. Lanier, "[Q]ualified immunity seeks to ensure that defendants 'reasonably can anticipate when their conduct may give rise to liability' . . . by attaching liability only if '[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"

---

[4] The appellees' actions in the instant case are indistinguishable from those which we held in McCoy v. Webster, 47 F.3d 404 (11th Cir. 1995), to be discretionary.  We summarily reject Powell's argument to the contrary.

9

___ U.S. ___, ___, 117 S. Ct. 1219, 1227 (1997) (alteration in original) (quoting Davis v. Scherer, 468 U.S. 183, 195, 104 S. Ct. 3012, 3019 (1984), and Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987), respectively).  When analyzing a claim of qualified immunity in a case which is in a Rule 12(b)(6) posture, we determine "'whether, under the most favorable version of the facts alleged, defendant's actions violate clearly established law.'" Fortner v. Thomas, 983 F.2d 1024, 1028 (11th Cir. 1993) (quoting Bennett v. Parker, 898 F.2d 1530, 1535 n.2 (11th Cir. 1990) (Tjoflat, J., concurring), cert. denied, 111 S. Ct. 1003 (1991)).

We turn first to Powell's substantive due process claim and then to his procedural due process claim.

## A.  Substantive Due Process Claim

Powell argues that the appellees violated his son's substantive due process rights by removing the baby from Odum's safe care and allowing the baby to return to a known zone of danger with an

abusive mother and stepfather.  Powell must prove more than negligent or wrongful acts on the part of the appellees or an abuse of power rising to the level of a constitutional violation.  In order to strip the appellees of their qualified immunity defense, Powell must demonstrate that the appellees violated <u>clearly established</u> constitutional rights of which a reasonable person would have known.  Two cases involving facts very similar to the instant facts, one a Supreme Court case and one an Eleventh Circuit case, persuade us that Powell cannot prove a violation of a clearly established constitutional right.

In <u>DeShaney v. Winnebago County Department of Social Services</u>, 489 U.S. 189, 109 S.Ct. 998 (1989), Joshua DeShaney and his mother brought a §1983 claim against social workers and other officials who failed to protect Joshua, despite suspecting that Joshua's father was abusing him.  The Supreme Court held that there was no substantive due process violation under the following circumstances.  After Joshua's parents divorced, the father was awarded legal custody of Joshua.  The first

complaint of child abuse occurred in January 1982. The Department of Social Services ("DSS") interviewed the father, who denied the accusations. DSS did not pursue the matter. In January 1983, Joshua was hospitalized with multiple bruises and abrasions. DSS was notified that child abuse was suspected, and custody was temporarily withdrawn from the father. The appropriate team of county officials considered the matter, determined there was insufficient evidence of child abuse, and decided to recommend that Joshua be returned to the father's custody. Based on this recommendation, the juvenile court returned Joshua to his father's custody. Thereafter, the following additional warning signals came to the attention of the defendant officials. A month later, Joshua was treated at the emergency room for suspicious injuries. During monthly visits in the next six months, the caseworker observed suspicious injuries on Joshua's head. In November 1983, Joshua was again treated at the emergency room for injuries believed to be caused by child abuse.

During the next two home visits, the caseworker was told that Joshua was too ill to see her. DSS took no action. In March 1984, Joshua was severely beaten by his father. As a result of this beating, Joshua sustained severe brain damage, which required that Joshua be permanently institutionalized. The Supreme Court held that "[a]s a general matter, . . . we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197, 109 S. Ct. at 1004. The Court also rejected Joshua's argument that a "special relationship" existed because the officials knew that Joshua faced a special danger of abuse at his father's hands, and had specifically proclaimed an intention to protect him against that danger. Id. at 197-98, 109 S. Ct. at 1004.[5]

---

[5] The Court distinguished the relationship created when a state restrains an individual's liberty such that it renders him unable to care for himself. See DeShaney, 489 U.S. at 198-200, 109 S. Ct. at 1004-06 (citing Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285 (1976) (incarceration); Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452 (1982) (involuntarily committed mental patients)).

The relevant Eleventh Circuit case is <u>Wooten v. Campbell</u>, 49 F.3d 696 (11th Cir.), <u>cert.</u> <u>denied</u>, 116 S. Ct. 379 (1995).  In <u>Wooten</u>, after a child was abducted by his father, the state agency comparable to the one involved in this case was awarded legal custody of the child and given the authority to place the child.  With the consent of the child's parents, the agency placed the child with the mother and allowed unsupervised visits by the father.  During an unsupervised visit, the father again abducted the child, killed the child, and then committed suicide. The mother brought a §1983 claim against the agency and its involved employees, alleging that the defendants were reckless in allowing the father to have unsupervised visits with the child when the evidence showed that the father posed a significant risk of danger to the child.  The district court dismissed the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Noting that the facts were very similar to those in <u>DeShaney</u>, this court affirmed, holding that there was no substantive due process violation.  <u>Id.</u> at 701.  Although the state

**14**

agency had legal custody of the child, this court emphasized that the mother herself had physical custody of the child and also had access to the courts had she wanted to challenge the unsupervised visitation.  Id. at 700.  As in the DeShaney case, this court stressed that the child had been killed by a private actor, the father, and not by the State.  Id.

Comparing the facts of the instant case to the facts in DeShaney, it is true that caseworker Jane Doe gave the baby's case very little attention after taking over responsibility from Rosen on August 30, 1993.  She merely had two telephone conversations with Newman, in whose custody Rosen had left the baby.  During one of these conversations, Jane Doe learned that Newman had permitted the mother to take the baby back to the mother's home, the environment in which it was suspected that previous child abuse might have occurred.  Jane Doe apparently did schedule a meeting with the mother and her husband, Loren, for that day, but they failed to appear at the meeting.  Jane Doe took no further

action.

While we do not condone Jane Doe's neglect, we nevertheless readily conclude that it is indistinguishable from the caseworker's failure to act in DeShaney.  Indeed, the danger signals in DeShaney (including one hospitalization and two emergency room visits, all indicating suspected child abuse) were more pronounced than in the instant case.  In an attempt to distinguish DeShaney, Powell points to the fact that the Supreme Court noted that the State in that case did not "do anything to render [the abused child] any more vulnerable" to abuse.  DeShaney, 489 U.S. at 201, 109 S.Ct. at 1006.  Powell argues that a plaintiff can make out a viable substantive due process claim by proving that the officials created or increased the danger to the child.  Powell contends that the increase in danger occurred in the instant case on August 29, 1993, when caseworker Rosen permitted the baby to be removed from the safe haven of Odum's home.[6]

---

[6] In his brief on appeal, Powell acknowledges that the "substantive claim does not hang on the two weeks of inactivity which triggers the

**16**

Recalling the facts, that night Newman and the mother, accompanied by a deputy sheriff, went to Odum's home and demanded that the baby be returned. The deputy telephoned Rosen, and Rosen actually went to Odum's home. After discussions in which the mother denied child abuse and related the explanation that the baby had fallen off the bed, Rosen allowed the baby to be released into Newman's custody at Newman's home. By allowing the baby to leave the safe haven of Odum's home, Powell argues that caseworker Rosen affirmatively increased the danger to which the baby was exposed.

We can assume arguendo, without deciding, that in some circumstances, a plaintiff might be able to establish a substantive due process violation upon proof that a state actor created or increased the danger to a child or rendered a child more vulnerable

_____

procedural claim. Instead, the substantive claim is triggered by the active and forcible abuse of Power [sic] by the state officials on one day, August 29, 1993." Appellant's Brief at 46 (emphasis omitted).

to abuse.[7] However, both <u>DeShaney</u> and <u>Wooten</u> indicate that Rosen's  allowing the baby to leave the safety of Odum's home cannot be the basis for a substantive due process claim in this case.  The language in <u>DeShaney</u> upon which Powell relies (i.e., about rendering the child more vulnerable) is followed immediately by language rejecting an argument precisely like Powell's:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.  That the State once took temporary custody of Joshua does not alter the analysis, <u>for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all</u> . . . .

---

[7] For cases discussing such claims, <u>see</u>, <u>e.g.</u>, <u>Mitchell v. Duval County Sch. Bd.</u>, 107 F.3d 837, 838-39 (11th Cir. 1997) (assuming <u>arguendo</u> that a plaintiff might be able to state a substantive due process claim if the state's actions placed the plaintiff in "special danger"); <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1205 (3d Cir. 1996) (discussing "state-created danger" theory); <u>Uhlrig v. Harder</u>, 64 F.3d 567, 572-73 & nn.6-7 (10th Cir. 1995) (discussing "creation of danger" theory), <u>cert.</u> <u>denied</u>, 116 S. Ct. 924 (1996); <u>Leffall v. Dallas Indep. Sch. Dist.</u>, 28 F.3d 521, 530-31 (5th Cir. 1994) (discussing "state-created danger" theory).

DeShaney, 489 U.S. at 201, 109 S. Ct. at 1006 (emphasis added). Although in this Rule 12(b)(6) posture, we do indulge the inference that Newman's home was less safe than Odum's, the danger signals apparent to Rosen in this case certainly do not exceed those apparent to the team which decided to return Joshua to his father in the DeShaney case. That team knew that Joshua had just been admitted to the hospital with multiple bruises and abrasions and that the examining physician suspected child abuse. The team also knew of the allegation of abuse one year earlier. In this case, we note that Rosen merely permitted the baby's grandmother, Newman, to take custody of the baby. Rosen specifically instructed that the baby was not to be returned to the mother in whose home the suspected abuse occurred. In this respect, the instant facts are more favorable to the appellees than those in DeShaney. We also note that Rosen's decision was made during an actual visit to the scene and followed her discussion with the mother, Newman, Odum, and the deputy sheriff, during which the

**19**

mother denied any abuse and gave an explanation for the baby's injuries. Finally, we note that the subsequent removal of the baby to the mother's home was without the appellees' permission, and thus is a mere failure to act similar to that in DeShaney. The government officials in DeShaney had greater dominion and control over Joshua (i.e., temporary legal custody) than did the appellees here. Similarly, the agency in Wooten had legal custody of the child, allowed the child to return to the mother's custody, and permitted unsupervised visits by the father, who was the alleged source of danger to the child. In neither DeShaney nor Wooten did the affirmative act of permitting the child's return to the home environment rise to the level of a substantive due process violation. In evaluating the asserted increased danger in DeShaney, the Court seemed to focus on the totality of the agency's actions, and in any event declined to place much significance on a single judgment call in returning Joshua to his home environment.

We recognize that the facts of DeShaney and

<u>Wooten</u> are not identical to the instant facts.  In <u>DeShaney</u>, the agency's decision to permit Joshua to return to his home environment was apparently in the nature of a recommendation to the juvenile court, which followed the agency's recommendation.  In <u>Wooten</u>, the similar decision was with the consent of the parents.  However, caseworker Rosen's decision clearly constituted an exercise of judgment very similar to that of the officials in <u>DeShaney</u> and <u>Wooten</u>.  Moreover, as in <u>Wooten</u>, Powell  and Odum "had access to the courts if [they were] displeased" with Rosen's decision.  <u>Wooten</u>, 49 F.3d at 700.

Because the appellees in the instant case claim qualified immunity, we need only decide that the appellees violated no clearly established constitutional rights.[8]  We readily conclude that the

_____

[8] As this court has explained previously,

Since a plaintiff must show both that there is a constitutional right that is allegedly violated and that the right was clearly established at the time, a negative decision on either prevents the plaintiff from going forward.  Once it is determined that there is no clearly established right, the Court could well leave for another day the

**21**

appellees' actions are sufficiently similar to the actions of the comparable officials in DeShaney and Wooten that it cannot be said that a reasonable official would have understood that the actions at issue in this case violated constitutional rights. Accordingly, we hold that the appellees are shielded by qualified immunity, and we affirm as to this claim.

B.  Procedural Due Process Claim

Powell alleges that the appellees' failure to follow the Richmond County Child Abuse Protocol ("the Protocol") violated his son's procedural due process rights.[9]  In their defense, the appellees

> determination as to whether there is such a right, albeit not one that a reasonable person would have known.  It is the plaintiff's burden to show that when the defendants acted, the law established the contours of a right so clearly that a reasonable official would have understood his acts to be unlawful.

Spivey v. Elliott, 41 F.3d 1497, 1499 (11th Cir. 1995).

[9] As quoted in the appellees' brief, the Protocol provides as follows:

When a report of child abuse/neglect is received by DFCS, the case shall be assigned to a caseworker to make an initial assessment/investigation (including whether the case is that of a caretaker or noncaretaker). In determining the appropriate action to be taken by DFCS, the caseworker shall go to where the child is located to conduct an interview with the child to establish that the child is in fact alleging abuse/neglect.

Appellees' Brief at 13. The Protocol, as quoted in Powell's complaint, further provides:

If there is reasonable cause to believe that abuse has occurred, DFCS shall take the following action or actions:

1. Seek protective custody of the child. (See Juvenile Court Section).
2. If appropriate, allow the child to remain with its family and provide ongoing monitoring and treatment.
3. Immediately notify the appropriate law enforcement agency pursuant to O.C.G.A. § 19-7-5. (See Law Enforcement Section).
4. File any and all Juvenile Court proceedings necessary
for the protection of the child.
5. If there is reasonable cause to believe abuse has occurred, DFCS will seek a physical examination in those instances where a medical test will be needed to substantiate the same, or will photograph evidence of physical abuse where a medical examination is not necessary. Any physical examination will

23

invoke the protections of qualified immunity.

Powell argues that <u>Zinermon v. Burch</u>, 494 U.S. 113, 110 S. Ct. 975 (1990), shows that the appellees violated his son's clearly established procedural due process rights.  In <u>Zinermon</u>, the plaintiff, a former state mental hospital patient, alleged that the State violated his due process rights by failing to have in place appropriate precommitment safeguards ensuring that state mental hospital patients are in fact competent to sign forms authorizing their

---

> be conducted as expeditiously as possible.
>
> . . .
>
> [I]f a report of child abuse . . . is made to DFCS . . . and it has reasonable cause to believe such report is true, then the agency shall immediately notify the appropriate authority or District Attorney and forward the proper reports within a timely manner.
>
> . . .
>
> Every abused child should have a physical examination as soon as possible following disclosure of the abuse.  Typically, the child will be examined at one of the local hospitals according to accepted hospital procedure.

Compl. at 12-13.

voluntary admission and treatment. The Supreme Court held that the plaintiff stated a procedural due process claim because the deprivation of the plaintiff's liberty was predictable and predeprivation process was feasible. Id. at 136, 110 S. Ct. at 989. Powell argues that Zinermon applies to this case. He asserts that the State should have provided predeprivation process in this case because the State should have anticipated that caseworkers might be so overloaded with cases that they would neglect their duties. He further contends that the value of predeprivation safeguards is high in child abuse cases and the State is in the position to provide predeprivation process.

The appellees, however, argue that Powell cannot state a claim for a violation of his son's procedural due process rights.[10] The appellees

---

[10] As a threshold matter, the appellees argue that the Protocol did not vest Powell's son with a legitimate claim of entitlement such that a failure to follow the Protocol constituted a procedural due process violation. Because we ultimately conclude that the appellees are entitled to qualified immunity in any event, we can assume arguendo, without deciding, that Powell's son had such a liberty interest.

assert that <u>Parratt v. Taylor</u>, 451 U.S. 527, 101 S. Ct. 1908 (1981), and <u>Hudson v. Palmer</u>, 468 U.S. 517, 104 S. Ct. 3194 (1984) control this case.  In <u>Parratt</u> and <u>Hudson</u>, the Supreme Court held that there is no procedural due process violation when the act complained of is the random and unauthorized act of a state employee for which adequate postdeprivation process is available.  <u>Hudson</u>, 468 U.S. at 533, 104 S. Ct. at 3203-04; <u>Parratt</u>, 451 U.S. at 541, 101 S. Ct. at 1916.  The <u>Parratt</u>-<u>Hudson</u> reasoning applies when the official action complained of is of a type that the State cannot reasonably foresee and for which predeprivation process thus is not feasible.  <u>Hudson</u>, 468 U.S. at 533, 104 S. Ct. at 3203; <u>Parratt</u>, 451 U.S. at 541, 101 S. Ct. at 1916.  <u>See</u> <u>also</u> <u>Zinermon</u>, 494 U.S. at 128-30, 110 S. Ct. at 985-86.  The appellees argue that in this case, the State could not reasonably foresee that the caseworkers would fail to follow the Protocol.  The appellees also contend that providing predeprivation process, such as a hearing, for child abuse cases is not feasible because caseworkers often must make quick judgment calls in such cases.

**26**

Furthermore, the appellees argue that the State has provided Powell with adequate postdeprivation process because Powell may pursue a damage claim in the Georgia state courts under the Georgia Tort Claims Act.[11]

The crux of Powell's claim is his contention that predeprivation process was feasible in this case and was not provided, thus violating the baby's procedural due process rights. In Zinermon, the Court found that a predeprivation procedure was feasible and would avert the problem of incompetent people signing voluntary admission forms before receiving treatment for mental illness. The Court explained that "had the State limited and guided petitioners' power to admit patients, the deprivation

---

[11] Powell argues that this post-deprivation process is inadequate because the State has invoked sovereign immunity as to any possible claims under the Georgia Tort Claims Act. However, assuming arguendo that the State is immune, Powell's argument is foreclosed by our decision in Rittenhouse v. DeKalb County, 764 F.2d 1451, 1459 (11th Cir. 1985) ("the sovereign immunity enjoyed by [the county and the government official] [does] not render appellant's state law remedy inadequate under Parratt"), cert. denied, 475 U.S. 1014, 106 S. Ct. 1193 (1986).

might have been averted."  Zinermon, 494 U.S. at 137, 110 S. Ct. at 989.  The Court indicated that the State could provide such guidance by having "a specific requirement that petitioners determine whether a patient is competent to consent to voluntary admission."  Id. at 135-36, 110 S. Ct. at 988-89.[12]

By contrast, in the instant case, the Protocol already provides predeprivation procedures for caseworkers to follow.  There is no other feasible predeprivation procedure that is readily apparent to us.  It is clear from the Protocol that a caseworker must make a judgment decision "[i]n determining the appropriate action to be taken."  Appellees' Brief at 13 (quoting Protocol).  The caseworker must make

_____

[12] At several places, the Court referred to such a procedure.  For example, the Court noted that "[t]here is, however, no specified way of determining, before a patient is asked to sign admission forms, whether he is competent." Zinermon, 494 U.S. at 136, 110 S. Ct. at 989.  See also id. at 135, 110 S. Ct. at 988 ("But the statutes do not direct any member of the facility staff to determine whether a person is competent to give consent, nor to initiate the involuntary placement procedure for every incompetent patient.").

an initial assessment and must determine on an ongoing basis whether or not there is "reasonable cause to believe that abuse has occurred."  Compl. at 12 (quoting Protocol).  We readily conclude that it would not be feasible to require a hearing before every such judgment decision by a caseworker.  Indeed, the Protocol established by the appellees in the instant case would seem to be precisely the kind of procedure contemplated in <u>Zinermon</u> because it guides caseworkers' decision-making.  We do not understand Powell to be challenging the adequacy of the Protocol itself; rather, he argues that caseworkers Rosen and Jane Doe did not follow the Protocol.

The only specific procedure suggested by Powell is that the officials should have provided more staffing, supervision, and training so that neglect of duty would not result from excessive caseloads.[13]  However, we know of no case which

---

[13] In his brief, Powell asserts that "the State was in a position to provide the requisite predeprivation process by oversight, supervision, adequate staffing and caseload distribution, management and training."  Appellant's Brief at 26-27.

has held that the Constitution requires a government to provide more personnel or more training in order to reduce the risk of random and unauthorized acts of neglect of duty. The <u>Parratt</u> decision suggests just the opposite. The deprivation there, as here, resulted from a failure to follow applicable procedures. <u>Parratt</u>, 451 U.S. at 531, 543, 101 S. Ct. at 1910, 1917. Although not mentioned by the Court, additional money, personnel, or training might well have averted the prison officials' negligence in failing to follow the policies and losing plaintiff's hobby kit.

Because the appellees have invoked the defense of qualified immunity, Powell must prove a violation of a clearly established constitutional right. Under the circumstances of this case, we cannot conclude that there was a clearly established constitutional right to some additional predeprivation procedure in this case. In other words, we cannot conclude that it was clearly established at the time of the appellees' actions in this case that an additional predeprivation procedure was feasible. Although the appellees'

actions were disastrous in hindsight, Powell has not demonstrated that the contours of his son's procedural due process rights were sufficiently clear that a reasonable official would understand that the conduct at issue here violated constitutional rights. Accordingly, we hold that the appellees are shielded by qualified immunity from Powell's procedural due process claim. We affirm the district court as to this claim.

## III. CONCLUSION

We are not without sympathy for Powell's situation. His son's death was an unquestionably cruel loss. For the foregoing reasons, however, we conclude that Powell has failed to surmount the appellees' qualified immunity shield with respect to either of his claims.[14]

AFFIRMED.

---

[14] Because the district court properly dismissed Powell's federal claims, it did not err by dismissing without prejudice his state law claim.