[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15237

_____

D.C. Docket No. 1:10-cv-02742-AT


NICOLE MADDOX,
Individually and as Next of Friend of J.O., Minor Child,

Plaintiff-Appellee,

versus

BABETTE STEPHENS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 21, 2013)

Before PRYOR and ANDERSON, Circuit Judges, and WALTER,* District Judge.

_____

* Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

ANDERSON, Circuit Judge:

Plaintiff Nicole Maddox ("Maddox" or "mother"), individually, and as Next of Friend of J.O., a minor child, brought suit for violations of due process rights under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, and for various state law torts. The suit was brought against the Georgia Department of Human Services, Division of Family & Children Services ("DFCS"), Gwinnett County DFCS, and Appellant Babette Stephens, a social worker with Gwinnett County DFCS ("Stephens") (collectively "Defendants").[1] The only claim directly relevant to this appeal is whether Appellant Stephens is entitled to qualified immunity on Maddox's substantive due process claim that Stephens violated her liberty interests in the care, custody, and management of her minor child ("child" or "J.O.") with respect to Stephens' actions in preparing and implementing a safety plan that allegedly prohibited Maddox from removing the child from the paternal grandmother's care. The district court denied Stephens summary judgment on this claim, holding that Stephens was not entitled to qualified immunity. Stephens now brings this interlocutory appeal.

After thorough review of the record, and with the benefit of oral argument,

---

[1]    Maddox also brought claims against Children's Healthcare of Atlanta, Inc., which are not presently before this Court.

2

we reverse the district court's denial of qualified immunity to Stephens on Maddox's substantive due process claim and remand for further proceedings not inconsistent with this opinion.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[2]

J.O. was born in early September 2008 to Maddox and Michael Olayiwola ("Mr. Olayiwola" or "father").  Maddox and Mr. Olayiwola were not married but were living together at the time in Gwinnett County, Georgia.  They also lived with Mr. Olayiwola's mother, Veronica Olayiwola ("Ms. Olayiwola" or "grandmother").  As the unwed mother of J.O., Maddox was the only person who had legal custody of J.O. prior to court proceedings on February 12, 2009, pursuant to O.C.G.A. § 19-7-25 ("Only the mother of a child born out of wedlock is entitled to custody of the child, unless the father legitimates the child . . . .  Otherwise, the mother may exercise all parental power over the child.").

On November 9, 2008, when J.O. was two months old, Maddox, Mr. Olayiwola, and Ms. Olayiwola took her to Children's Healthcare of Atlanta, Inc. ("Hospital").  J.O. was diagnosed with a rare, potentially life-threatening disease

---

[2]    Many of the relevant facts are also discussed in the Discussion section infra.  On interlocutory appeal of a district court's denial of summary judgment, denying qualified immunity, "we do not make credibility determinations or choose between conflicting testimony, but instead accept Plaintiff's version of the facts drawing all justifiable inferences in Plaintiff's favor."  Bozeman v. Orum, 422 F.3d 1265, 1267 (11th Cir. 2005).

3

known as Kasabach-Merritt Syndrome.  This is a chronic illness, and J.O. required 24-hour daily care.  J.O. remained in the Hospital during many of the relevant events and was discharged on December 10, 2008, to the father and the grandmother.

Because both Mr. Olayiwola and Maddox worked, Ms. Olayiwola stayed with J.O. at the Hospital on a daily basis and received training on how to care for J.O.'s medical needs.  Maddox did not own a car and did not have a driver's license, so she relied on Mr. Olayiwola and other family members for transportation to the Hospital.[3]  Because of her work schedule and lack of transportation, Maddox was not able to visit J.O. daily while J.O. was in the Hospital.  Ms. Olayiwola was the only family member qualified to care for the special needs of the child while the child was in the Hospital.

On November 12, 2008, Mr. Olayiwola and Maddox had a heated verbal argument.  The argument continued as they arrived at the Hospital, and security officers were called to the scene.  Both parties were advised that any future similar conduct would result in both being asked to leave the Hospital.  Social workers at the Hospital then spoke with Mr. Olayiwola and Maddox regarding the dispute.  During these meetings with the social workers, both parties made allegations of

---

[3]    Maddox worked approximately 34-36 hours per week.

abuse and neglect against each other.  Mr. Olayiwola alleged that Maddox was using drugs and would leave J.O. in the apartment unsupervised, and Maddox alleged that Mr. Olayiwola was physically abusive.  Because of these allegations, the matter was referred to Gwinnett County DFCS.  Stephens was the Social Services Caseworker responsible for after-hours referrals at this time.  Stephens went to the Hospital the next day and spoke directly with Mr. and Ms. Olayiwola.  She informed Mr. Olayiwola that just being J.O.'s father did not give him any legal rights and explained the legitimization process.  She later spoke with Maddox by telephone, and Maddox informed her that she was now temporarily staying with her sister in Fulton County, Georgia, after the argument.[4]  The matter was also referred to the Hospital's daytime social worker, Tonya Brailey ("Brailey").

On November 14, 2008, Stephens talked with Brailey about involving ChildKind, a placement service for medically fragile children, in the case.  On November 19, 2008, Brailey again talked to Stephens regarding the placement with ChildKind, but Stephens had not completed the referral and stated she would look into it.  Brailey also talked to Maddox and told her that J.O.'s medical care was going to be intensive and that Maddox needed to be available to get training when

---

[4]    Stephens confirmed that Mr. Olayiwola had been physically abusing Maddox, but she did not substantiate Mr. Olayiwola's allegations of Maddox's drug use and behavior.

5

J.O. was discharged from the Hospital.  Maddox indicated that she would be getting a car in the next few weeks, but in the meantime she could use Medicaid transportation to make herself available for the training.  The record does not reveal that Maddox began training to take care of J.O. at this time nor at any time prior to J.O.'s release from the Hospital.

On November 25, 2008, Brailey and Stephens discussed the possibility of preparing a safety plan to avoid sending the child to a facility when J.O. was discharged, and they planned to meet with the parents and the grandmother on December 1.  A safety plan is prepared by DFCS employees when there is an identified risk of safety to the child.  It is an agreement between DFCS and the child's caregiver and addresses areas of concern regarding the health of the child.

Two days later, on November 27, 2008, there was a physical altercation involving the grandmother and Maddox at the Hospital.  Maddox was expelled from the Hospital and told not to come back or she would be charged with criminal trespassing.  Stephens spoke with Maddox regarding this incident on the following Monday (December 1).  After speaking with Maddox, Stephens called Brailey and asked that Maddox at least be granted supervised visitation at the Hospital.  Although Brailey said that the Hospital would consider this possibility, she believed that the ban was "final."  Although the December 1 meeting with the

6

parents and the grandmother did not occur, Brailey informed Stephens during their telephone calls on December 1 that J.O.'s medications had again been changed and that there was still no expectation of a discharge date.

That same day, Stephens called Mr. Olayiwola to follow up on his efforts to seek custody of J.O. Although she testified that it was contrary to DFCS standard practices, Stephens called the Gwinnett County Superior Court at Mr. Olayiwola's request to ask about the status of his petition for legitimation and custody. The court informed her that the hearing likely would not be before January 2009 and thus that Mr. Olayiwola could not be legitimated before that time. Stephens again explained to the father that, as a non-married father, he had to go through court proceedings to establish his paternity.

On December 8 and December 9, Stephens informed Brailey that DFCS could not authorize custody or discharge to the father because the father had not been legitimated. Stephens also informed Brailey that, because she had recently learned that Maddox now resided in Fulton County, she did not believe that Gwinnett County DFCS could deprive the child and that she was transferring the case to Fulton County DFCS.

On December 9, Brailey notified Stephens that J.O. was to be released to the father during the upcoming week. After speaking with Hospital administration,

7

Brailey was informed that the child could be released to the father despite the fact that DFCS could not authorize such release. On December 10, 2008, Hospital officials discharged J.O. to Mr. Olayiwola—knowing that Ms. Olayiwola, the only family member qualified to care for the child, would be living with him and providing care—because he was originally presented as the father of the child and because the child had not been deprived by DFCS. Neither the Hospital nor Stephens notified Maddox that J.O. was released. Stephens assumed, after notifying Fulton County DFCS that the child had been released, that Fulton County DFCS would notify Maddox.

After Stephens contacted Fulton County DFCS to advise them of J.O.'s release, she spoke with Anne Rae ("Rae"), her supervisor, who advised her to prepare a safety plan ("Safety Plan"). The night J.O. was released from the Hospital, Stephens met with the grandmother at her residence and prepared the Safety Plan.[5] While preparing the Safety Plan, Stephens was aware that Maddox

---

[5]    The district court found that the "evidence is in dispute as to when the safety plan was actually prepared." Doc. 115 at 20 n.26. Stephens testified in her deposition that the Safety Plan was prepared after J.O. was released from the Hospital at the grandmother's apartment. By contrast, the grandmother testified at the juvenile court proceedings that she left the hospital with the Safety Plan in hand. However, Maddox waived any challenge that there was a material issue as to this point. At the motion for summary judgment stage, Stephens prepared a "statement of material facts" that stated, in relevant part: "[t]hat evening, after Stephens was advised that [Hospital] had discharged J.O., Stephens' supervisor . . . instructed Stephens to meet with [father and/or grandmother] to create a document known as the 'Safety Plan.'" Doc. 79-1 at 11. In response, Maddox "admitted" this material fact. Furthermore, in Maddox's response to

8

was the only person with legal custody of the child.  Maddox, however, was not present for the signing of the Safety Plan.

The Safety Plan provides, in relevant part, that:

"[Grandmother] will contact Babette Stephens in the event Natural Mother, Nicole Maddox or anyone else attempt to remove [J.O.] from [grandmother's] care."
"[Grandmother] will also contact Gwinnett P.D. immediately if anyone attempts to remove [J.O.] from [grandmother's] care."
"[Grandmother] will assure [J.O's] medical needs are met and follow the home care and follow-up appointment as instructed and explained at [J.O.'s] release from the hospital 12/10/08."
"Family will continue to cooperate with the Department during this investigation and follow recommendations as presented."
"Family will notify Stephens and the Department of any changes in address and phone numbers immediately."

This Safety Plan was signed by Ms. Olayiwola and Stephens.  Maddox was not notified before the preparation of this Safety Plan and did not sign the Safety Plan.

Willa Wagner Howick, J.O.'s guardian ad litem, testified, and it is undisputed for purposes of this appeal, that Maddox was not properly trained to

---

Defendants' motion for summary judgment, she stated that, "Stephens, the evening of December 10, 2008, went to [grandmother's] apartment and prepared the safety plan, signed only by her and [grandmother]."  Doc. 94 at 12.  Maddox has admitted that Stephens prepared the Safety Plan after J.O. was released from the Hospital for purposes of this appeal.

Moreover, all of the documentary evidence supports that the Safety Plan was prepared after J.O.'s discharge and at Mr. and Ms. Olayiwola's apartment.  It is doubtful that a reasonable jury could find, on this record, solely on the basis of the grandmother's remarks at a hearing focused on other matters, that the Safety Plan was actually prepared before J.O.'s discharge. However, we do not in any event believe that this factual issue is material to this appeal.

9

take care of the child at the time of discharge.  The only family member trained to care for the child at the time of discharge was the grandmother.

After Maddox called the hospital to check on J.O. and was informed that J.O. had already been discharged, Maddox called Stephens.  Maddox asked Stephens how they could release J.O. without telling her and told Stephens that she wanted to go get J.O. from the grandmother's apartment.  According to Maddox, Stephens told her "you can't go over there and get her and that it will only make things worse, that if the police are involved . . . . then [J.O.] could be taken away from both of the parents and that [J.O.] could be placed in a foster home."

Despite Stephens' advice, Maddox went to Mr. and Ms. Olayiwola's apartment.  Ms. Olayiwola would not open the door and called the police and Stephens.  Maddox also called the police.  When the police arrived, an officer went inside the apartment and Ms. Olayiwola provided the officer with a copy of the Safety Plan.  The police officer then spoke with Stephens on the telephone.  After the officer talked on the phone with Stephens, Maddox was not permitted to see the child.  After the police showed Maddox a copy of the Safety Plan—the first time she had seen it—she left the apartment.

Nothing in the record indicates precisely what was said during the telephone call between the police officer and Stephens.  However, taking all reasonable

10

inferences in favor of Maddox, we assume that Stephens made statements on the telephone that night—to the police, to Maddox, and to the grandmother—that led them all to believe that Maddox should not be permitted to take J.O. away because Maddox was incapable of caring for the child's medical needs.

After Stephens spoke with the grandmother and the police, she drove to the apartment but arrived after both the police and Maddox had left. While at the apartment, Stephens talked to the grandmother, and also talked to Maddox on the telephone. Stephens asked Maddox why she was trying to see J.O. so late at night and why she had left. Maddox responded that she left because the police were there.

On February 5, 2009, in response to Mr. Olayiwola's Petition for Legitimization and Custody/Visitation, Maddox filed an Amended Answer, Counterclaim and Motion for Immediate Change of Custody and a Response to Plaintiff's Request for Full Custody. At a hearing that month, the Gwinnett County Superior Court approved Mr. Olayiwola's petition for legitimization, ordered that physical custody be with Mr. Olayiwola, ordered that temporary joint legal custody be with Mr. Olayiwola and Maddox, transferred the case to Gwinnett County Juvenile Court, and appointed a guardian ad litem "due to the child's frail health, need for constant medical attention, and a pending DFCS investigation." Doc. 105-

11

4 at 1-2.[6] After this hearing, Maddox began attending J.O.'s doctor's appointments and began training to provide care for J.O.

After an August 17, 2009, hearing, the juvenile court held that "the child has been well-taken care of by the grandmother, who has undergone the training and education." Id. at 6. The court continued that "[t]he child has continued to progress and stay safe with the grandmother and the medical care givers believe that the child is well-taken care of." Id. Although the court was "deeply troubled by the procedural history of this case," and although Maddox had "regularly and consistently attended the out patient appointments to learn how to care for her daughter and is continuing to learn procedures and the medication regimen," the court granted emergency temporary custody to the grandmother because "the grandmother is the only person involved in the child's life who is capable of properly caring for the child at this time." Id. at 6-7.

After a September 9, 2009, hearing, the juvenile court again held that "[t]he mother needs more parenting time to demonstrate to the Court and the medical team that she is capable of caring for her child on her own." Doc. 105-5 at 2. After a November 12, 2009, hearing, the court ordered that Maddox shall have both physical and legal custody of J.O.

---

[6]    Howick was subsequently appointed as guardian ad litem.

Maddox subsequently filed her complaint under § 1983 against Defendants, claiming constitutional and state law violations.  As relevant to this appeal, Maddox alleged that Stephens violated her substantive due process rights by interfering with her protected liberty interest in the care, custody, and management of her child.  Maddox also alleged that Stephens' failure to follow Georgia law and administrative protocols constituted a procedural due process violation.

Defendants filed a motion to dismiss on September 30, 2010.  On November 19, 2010, the district court granted in part and denied in part Defendants' motion to dismiss.  As relevant to the instant appeal, the district court granted the motion to dismiss on Maddox's procedural due process claim against Stephens, but denied the motion to dismiss on Maddox's substantive due process claim against Stephens. With regard to the procedural due process claim, the district court held that Stephens' failure to follow those procedures was "a random and unauthorized act of a state employee for which adequate postdeprivation process is available."  Doc. 33 at 15 (quoting Powell v. Ga. Dep't of Human Res., 114 F.3d 1074, 1081 (11th Cir. 1997)) (internal quotation marks omitted).  The district court further held that "Maddox may seek postdeprivation relief in the form of damages under Georgia tort law."  Id. (citing Powell, 114 F.3d at 1074).  Accordingly, the district court

13

dismissed Maddox's procedural due process claim.[7]  The district court did find, however, that Maddox had adequately pled her substantive due process claim that Stephens had unconstitutionally interfered with Maddox's constitutionally protected liberty interest in the care, custody, and maintenance of her child; the district court denied Defendants' motion to dismiss on this claim.  Id. at 13.

After discovery, Defendants filed a motion for summary judgment.  On September 28, 2012,[8] the district court entered an order granting in part and denying in part Defendants' motion for summary judgment.  As relevant to this appeal, the district court denied Stephens summary judgment on Maddox's substantive due process claim, finding that it could not conclude at the summary judgment stage that Stephens was entitled to qualified immunity.  Stephens timely filed this interlocutory appeal, arguing that the district court erred by denying her qualified immunity on Maddox's substantive due process claim.

## II.  STANDARD OF REVIEW

We review de novo a district court's denial of summary judgment based on

---

[7]    Because this claim was dismissed at the motion to dismiss stage and is not properly subject to interlocutory review, Maddox's procedural due process claim is not properly before us on appeal.

[8]    This case was originally assigned to Judge Thomas Thrash, who ruled on the motion to dismiss proceedings.  The case was then transferred to Judge Amy Totenberg when she was appointed to the bench in March 2011.

14

qualified immunity, applying the same legal standards as the district court. Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2553 (1986). We view the record and draw all reasonable inferences in the light most favorable to the non-moving party. Sims v. MVM, Inc., 704 F.3d 1327, 1330 n.2 (11th Cir. 2013).

## III.  DISCUSSION

### A.

The Fourteenth Amendment of the United States Constitution protects against deprivation by state action of a constitutionally protected interest in "life, liberty, or property" without the due process of law. Zinermon v. Burch, 494 U.S. 113, 125, 110 S. Ct. 975, 983 (1990). The Due Process Clause provides two different kinds of constitutional protections: procedural due process and substantive due process. McKinney v. Pate, 20 F.3d 1550, 1555 (11th Cir. 1994) (en banc). A violation of either of these two kinds of protection may form the basis for a suit under § 1983. Id.

15

The Supreme Court has held that "parents have a constitutionally protected liberty interest in the care, custody and management of their children." Doe v. Kearney, 329 F.3d 1286, 1293 (11th Cir. 2003) (citing Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982)). This interest "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]." Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000); see also Quilloin v. Walcott, 434 U.S. 246, 255, 98 S. Ct. 549, 554 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S. Ct. 1526, 1541-42 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."). It is undisputed in this case that Maddox has a liberty interest in the care, custody, and management of J.O. Maddox argues that Stephens violated this liberty interest, and therefore that she has sufficiently asserted a substantive due process violation.

However, "not every wrong committed by a state actor rises to the level of a 'constitutional tort,' sufficient to trigger a substantive due process violation," Lee v. Hutson, 810 F.2d 1030, 1032 (11th Cir. 1987), as "the Constitution does not

16

protect against all encroachments by the state onto the interests of individuals,"
Robertson v. Hecksel, 420 F.3d 1254, 1262 (11th Cir. 2005).  The Supreme Court
has "previously rejected claims that the Due Process Clause should be interpreted
to impose federal duties that are analogous to those traditionally imposed by state
tort law," Collins v. City of Harker Heights, Tex., 503 U.S. 115, 128, 112 S. Ct.
1061, 1070 (1992), and it is clear that "[m]ere negligence does not rise to the level
of a Fourteenth Amendment violation," Bendiburg v. Dempsey, 909 F.2d 463, 470
(11th Cir. 1990); see also Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849, 118 S.
Ct. 1708, 1718 (1998) ("[L]iability for negligently inflicted harm is categorically
beneath the threshold of constitutional due process."); Waddell v. Hendry Cnty.
Sheriff's Office, 329 F.3d 1300, 1305 (11th Cir. 2003) ("We know for certain . . .
that a showing of negligence is insufficient to make out a constitutional due
process claim.").  Instead, plaintiffs face a high bar when attempting to establish a
substantive due process violation as "conduct by a government actor will rise to the
level of a substantive due process violation only if the act can be characterized as
arbitrary or conscience shocking in a constitutional sense."  Waddell, 329 F.3d at
1305.  Even intentional wrongs seldom violate the Due Process Clause, id., and
"only the most egregious official conduct can be said to be 'arbitrary in the
constitutional sense,'" Cnty. of Sacramento, 523 U.S. at 846, 118 S. Ct. at 1716

17

(quoting Collins, 503 U.S. at 129, 112 S. Ct. at 1071). "Determinations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor must be egregious—that is, shock the conscience—at the time the government actor made the decision." Waddell, 329 F.3d at 1305. Conduct intended to injure in some way that is unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level, id., and we must conduct an "exact analysis of circumstances before any abuse of power is condemned as conscience shocking," Cnty. of Sacramento, 523 U.S. at 850, 118 S. Ct. at 1718-19.

Finally, the Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Collins, 503 U.S. at 125, 112 S. Ct. at 1068; see also Waddell, 329 F.3d at 1304 ("We must take seriously the Supreme Court's caution against expanding the concept of substantive due process."). Specifically, in § 1983 cases asserting violations of parental liberty interests, "we are venturing into the murky area of unenumerated constitutional rights." Robertson, 420 F.3d at 1256 (quoting McCurdy v. Dodd, 352 F.3d 820, 825 (3d Cir. 2003)). In determining whether the plaintiff has alleged an actual deprivation of a constitutional violation, we must "tread lightly" because, "[b]y

18

extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action.  We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field,' lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court." Id. (quoting Washington v. Glucksberg, 521 U.S. 702, 720, 117 S. Ct. 2258, 2267-68 (1997)).

Even if we were to find that Stephens violated Maddox's constitutional rights, Stephens is not liable if she is protected by qualified immunity.  Qualified immunity offers "complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)).  The doctrine protects from suit "all but the plainly incompetent or one who is knowingly violating the federal law," id. (quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)), and prevents public officials from being intimidated—by the threat of lawsuits that jeopardize the official and her family's welfare personally—from doing their jobs, Foy v. Holston, 94 F.3d 1528, 1534 (11th Cir. 1996).  It is a

19

"muscular doctrine that impacts on the reality of the workaday world as long as judges remember that the central idea is this pragmatic one: officials can act without fear of harassing litigation only when they can reasonably anticipate—before they act or do not act—if their conduct will give rise to damage liability for them." Id. (citing Davis v. Scherer, 468 U.S. 183, 195, 104 S. Ct. 3012, 3019-20 (1984)). "If objective observers cannot predict—at the time the official acts—whether the act was lawful or not, and the answer must await full adjudication in a district court years in the future, the official deserves immunity from liability for civil damages." Id. (citing Elder v. Holloway, 510 U.S. 510, 513-15, 114 S. Ct. 1019, 1022 (1994)).

If the public official first shows that she was acting within the scope of her discretionary authority—a burden undisputably met by Stephens here—the burden shifts to the plaintiff to establish that qualified immunity is not appropriate. Id. at 1532. To determine whether a plaintiff has met her burden, a court must both "decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808, 816 (2009). A court may undertake these two inquiries in either order. Id. at 236, 129 S. Ct. at 818. Accordingly, we are afforded the flexibility to

20

determine that the right allegedly violated was not clearly established without deciding whether a constitutional violation occurred at all.  See, e.g., Loftus v. Clark-Moore, 690 F.3d 1200, 1204 (11th Cir. 2012); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1291 (11th Cir. 2009).

A right may be clearly established for qualified immunity purposes in one of three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."  Lewis, 561 F.3d at 1291-92 (internal citations omitted).  It is undisputed that only the third and final category is relevant to this appeal, and thus that Stephens is entitled to qualified immunity unless her conduct fits into this third category.  This third category, however, is "narrow" and "encompasses those situations where 'the official's conduct lies so obviously at the very core of what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.'"  Loftus, 690 F.3d at 1205 (quoting Terrell v. Smith, 668 F.3d 1244, 1257 (11th Cir. 2012)).

"The inquiry whether a federal right is clearly established 'must be

21

undertaken in light of the specific context of the case, not as a broad general proposition.'" Id. at 1204 (quoting Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)). "The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable [state official] that [her] conduct was unlawful in the situation [she] confronted." Id. (quoting Vinyard, 311 F.3d at 1350). "Violations of the right to family association are determined by a balancing of competing interests," and we have held that "state officials who act to investigate or protect children where there are allegations of abuse almost never act within the contours of 'clearly established law.'" Foy, 94 F.3d at 1537.

### B.

We stress that, on appeal, only Maddox's substantive due process claim is properly before us. And, after thorough review, we hold that, even assuming arguendo that Maddox has established a procedural due process violation and even assuming arguendo that Stephens violated Maddox's substantive due process rights, Stephens is entitled to qualified immunity because the law was not clearly established that Stephens' actions were so conscience shocking as to violate Maddox's liberty interest in the care, custody, and management of J.O.

The precise factual context is important to understand our holding that the

22

undisputed facts demonstrate that Stephens is entitled to qualified immunity on this substantive due process claim.  First, a reasonable jury could not find that Stephens bore responsibility for the actual discharge of the child to the father and the grandmother.  Stephens told Brailey and the Hospital on December 8 and 9—two days and one day before J.O. was discharged from the Hospital—that neither she nor Gwinnett County DFCS could authorize the child's release to the father because the father had not been legitimated.  Brailey responded that she was aware of this fact, but the Hospital administration nevertheless released the child to the father and grandmother on December 10 despite Stephens' clear indications that Gwinnett County DFCS could not authorize such release.

Second, it is undisputed that Stephens believed that Maddox had moved her domicile to Fulton County in December of 2008.  Accordingly, before even being notified of J.O.'s impending release, Stephens had begun initiating proceedings to transfer the case to Fulton County.[9]  The record confirms that Cheryl D. Ward, a Social Services Supervisor for Fulton County DFCS, received notification of this transfer at least by December 9, one day before J.O.'s release from the Hospital.

---

[9]    Maddox has not argued below and does not argue on appeal that Stephens should not have transferred the case to Fulton County.  In other words, Maddox does not dispute that Fulton County DFCS should have had primary jurisdiction and responsibility as of the time the child was discharged by the Hospital into the care of the father and the grandmother.

23

The record also reveals that Stephens had informed Brailey on December 8—prior to Stephens learning that the child was going to be discharged that week—that the case was being transferred to Fulton County DFCS because the mother was no longer a resident of Gwinnett County. Brailey then spoke with Stephens on December 10, informed her that the child was to be released, and spoke with Ward (of Fulton County DFCS) to notify her of J.O.'s discharge. The record indicates that Stephens and Rae believed that they were not able to authorize any deprivation proceedings because the mother was not residing in Gwinnett County, and Stephens also relayed this fact to Brailey.

Third, it is undisputed that J.O. had serious medical needs and that Maddox was not qualified to care for those needs. It is also undisputed that the grandmother was the only family member who was qualified to care for the medical needs of the child. And it is undisputed that serious risks to the health and safety of the child would have been posed if the child were under the sole care of Maddox. Maddox was not qualified to care for the child's needs because she had not received the necessary training before J.O.'s discharge from the Hospital. On this summary judgment record, no reasonable jury could find otherwise with respect to these facts.

Fourth, no reasonable jury could find that Stephens bore responsibility for

24

the fact that Maddox was not trained to take care of the medical needs of the child.

A meeting had been scheduled for December 1, 2008, for Stephens, Brailey, the

parents, and the grandmother to discuss arrangements for the care of J.O. upon her

discharge from the Hospital.[10]  The evidence indicates that Maddox visited the

child on Thanksgiving Day, November 27, and that an altercation occurred

between Maddox and the grandmother.  Hospital security investigated and imposed

a ban on Maddox's presence at the Hospital.  The next day, Brailey talked with

Maddox and the grandmother, and advised Maddox that she would not be

permitted to visit the Hospital, and furthermore that she was not sure that the

December 1 meeting would still take place.  Stephens was not involved in, and was

not even aware of, any of these events until the following Monday, December 1.

After talking with Maddox about the Thanksgiving Day incident on December 1,

Stephens contacted both Brailey and Hospital security and requested that Maddox

at least be granted supervised visits with the child.  Brailey indicated that she

would check to see if anything could be done but that she believed the decision was

final.  On this summary judgment record, no reasonable jury could find that

---

[10]    On November 25, Stephens and Brailey had planned to schedule this meeting for December 1 whereby they would prepare a safety plan with the grandmother and the mother that would not require the child to be placed with child care.  Obviously, Stephens and Brailey were contemplating a consensual agreement such that the grandmother would provide the necessary care for the child upon her discharge from the Hospital.

25

Stephens bore responsibility for the fact that Maddox was banned from the Hospital or for the fact that Maddox did not receive the training that would have been necessary for her to become qualified to care for the child's medical needs.[11]

Considering these facts, the primary possible deficiency with respect to Stephens' actions is the failure to trigger court action within seven days following the discharge to the father and grandmother pursuant to O.C.G.A. § 15-11-14. However, Maddox's procedural due process claims are not before us because they were dismissed at the motion to dismiss stage in this litigation. Although the only claim Maddox is pursuing in this appeal is a substantive due process claim, it is apparent that the focus of her challenge to Stephens' actions is that Stephens failed to follow the procedures set out in the Georgia statutes for depriving a parent of custodial rights.[12] To facilitate a better understanding of her appeal, we set out first

---

[11]    Prior to this incident, on November 14, Brailey had advised Maddox that she needed to begin training to take care of the child. There is no record evidence that Stephens' actions in any way contributed to or caused Maddox not to begin training.

Moreover, the record suggests that it was probably impossible in any event to fully train Maddox prior to the time the child was discharged from the Hospital. As of February 5, 2009, the matter of Maddox's custodial rights was under the supervision of the state court. On that date, Maddox filed a counterclaim in the father's previously filed legitimization proceedings. Significantly, although court supervision of the matter commenced in February 2009, and the training of Maddox commenced shortly thereafter, the juvenile court could not conclude that Maddox was capable of caring for her child until after a hearing on November 12, 2009, where the court awarded Maddox full legal and physical custody of J.O.

[12]    See, e.g., Appellee Br. at 16 ("Then in violation of [Maddox's] and J.O.'s [Fourteenth] Amendment rights to liberty they gave custody of J.O. to [Ms. Olayiwola] without

26

her argument that Stephens violated her procedural due process rights, followed by the arguments for Stephens in response, and finally we explain why the instant facts fall far short of a clearly established substantive due process claim.

Maddox's argument in support of finding a violation of her procedural due process rights proceeds along the following line.[13]  Maddox argues that, even if Stephens bore no responsibility for the initial discharge by the Hospital of the child to the father and grandmother, Stephens' preparation of the Safety Plan, and her telephone conversations with the grandmother, Maddox, and the police officer on the night that Maddox appeared at the grandmother's residence and sought to take the child home with her at least contributed to the continued deprivation of her custodial right (as the only person with legal custody) to have physical custody of the child.  Maddox argues that a reasonable jury could find that Stephens told the grandmother, Maddox, and the police officer in those telephone conversations that Maddox should not be permitted to take the child away from the grandmother because that would pose a serious risk to the safety of the child, and that the Safety

court authority and in violation of Georgia law, DFCS' written procedures and Children's Healthcare's written procedures."); id. at 22 ("Stephens then failed to seek a unilateral emergency care seven-day temporary placement as authorized within DFCS' procedures or seek the intervention of the juvenile court for a temporary placement.").

[13]       We express no opinion at all with respect to whether there actually was a violation of Maddox's procedural due process rights.

27

Plan contemplated just such a consequence.  Maddox argues that, as the only person with legal custody of the child, those actions contributed to the temporary deprivation of her custodial rights by preventing her from taking physical custody of the child.  She argues that Georgia's statutory procedures clearly establish the procedures for depriving a mother of custody of her child.  For example, O.C.G.A. § 15-11-14 establishes that the "Department of Human Services is authorized to provide emergency care and supervision to any child without seeking a court order for a period not to exceed seven days."  O.C.G.A. § 15-11-14(a).  The statute then provides that, "[u]pon the expiration of such seven-day period, if the child or children have not been released  . . . or if the department determinates that there is an issue of neglect, abandonment, or abuse, the department shall promptly contact a juvenile court intake officer or bring the child or children before the juvenile court."  Id. § 15-11-14(d).  It is undisputed that Stephens was aware of these state procedural requirements.  Thus, the argument in favor of finding a violation of clearly established procedural due process rights is that Stephens willfully bypassed the procedures set forth by the Georgia code and Georgia case law.  In other words, Maddox's argument is that there are issues of fact as to whether an emergency existed, and thus whether it was appropriate under § 15-11-14 to discharge to (or prolong the deprivation resulting from the discharge to) the father

28

and grandmother—thus temporarily depriving her of her custodial rights—without complying with the required notice and court action.[14]  And the argument continues: even if there were an emergency and the initial discharge of the child to the father and grandmother was justified under § 15-11-14(a), nevertheless Stephens' failure to trigger court action within seven days pursuant to § 15-11-14(d) violated clearly established procedural due process rights.[15]

The argument against finding that Stephens violated a clearly established procedural due process right is that the procedures do not speak clearly to the situation here—where the grandmother has already been given custody of the child by a party other than the Department of Human Services—i.e., the Hospital.  The argument continues that Stephens was faced with the following situation.  The

---

[14]     In non-emergency situations, Georgia has procedural requirements of court action and notice before the deprivation of children.  See generally Watkins v. Watkins, 266 Ga. 269, 466 S.E.2d 860 (Ga. 1996); Sanchez v. Walker Cnty. Dep't of Family & Children Servs., 237 Ga. 406, 229 S.E.2d 66 (Ga. 1976).

[15]     Of course, the law is well established that the mere failure to follow state procedures does not necessarily rise to the level of a violation of federal procedural due process rights.  See Harris v. Birmingham Bd. of Educ., 817 F.2d 1525, 1528 (11th Cir. 1987) ("[W]e emphasize that the violation of a state statute outlining procedure does not necessarily equate to a due process violation under the federal constitution.  If otherwise, federal courts would have the task of insuring strict compliance with state procedural regulations and statutes.").  Moreover, with respect to a federal claim of a violation of federal procedural due process rights, the availability of state remedies can be relevant, as the district court found in granting the motion to dismiss Maddox's procedural due process claim.  See, e.g., Powell, 114 F.3d at 1080-83.  Because we need not decide whether there was a violation of clearly established procedural due process rights, we do not give further consideration to such case law.

child was in the care of the grandmother, the only family member capable of providing appropriate care for the child's serious medical needs.  Removal of the child from the care of the grandmother—i.e., removal by Maddox who was not qualified to care for the child's medical needs—would pose a serious threat to the safety of the child.  Thus, Stephens argues that it was absolutely necessary for the safety of the child to prepare the Safety Plan and to ensure that the child was not removed from the care of the grandmother.

However, the foregoing does not respond to Maddox's argument that even if Stephens bore no responsibility for the initial discharge by the Hospital to the father and the grandmother, nevertheless her subsequent actions prolonged the deprivation of Maddox's custodial rights, and that Stephens was required to trigger court proceedings within seven days, as provided in § 15-11-14.  Stephens' response to this argument is that it was not unreasonable for her to believe that Fulton County should have had primary jurisdiction regarding this case and therefore that Fulton County DFCS—and not Gwinnett County DFCS—may have been responsible for initiating deprivation proceedings.[16]  In sum, Stephens would argue that, even assuming arguendo that § 15-11-14 applied to this situation, it was

---

[16]    As noted above, both Stephens and Rae did not believe that Gwinnett County should initiate deprivation proceedings because Maddox no longer resided in Gwinnett County.

30

not clearly established that she should have triggered court action within seven days given the unique factual context described above—i.e., that Gwinnett County DFCS was not involved in the release of the child to the father and the grandmother, that the State did not take custody of the child, and that a reasonable official in Stephens' situation could have believed that any necessary court action should be initiated by Fulton County DFCS because Maddox's residence had moved to Fulton County.[17]

However, as noted above, Maddox's procedural due process claim is not before us. The arguments above are relevant only in that they reveal the facts relevant to Maddox's substantive due process claim, and the deficiencies with respect to Stephens' actions that Maddox argues violated her clearly established substantive due process rights. Thus, we express no opinion at all with respect to any procedural due process claim because only Maddox's substantive due process claim is properly before us in this appeal. And, for purposes of addressing Maddox's substantive due process claim, we can assume arguendo that Stephens

---

[17]    Maddox further argues that, even if it were clear that her move to Fulton County meant that Fulton County DFCS, rather than Gwinnett County DFCS, had primary jurisdiction, O.C.G.A. § 15-11-38 permits "any person . . . who has knowledge of the facts alleged or is informed and believes that they are true" to trigger court action. Id. (emphasis added). Stephens would argue that nevertheless a reasonable official could have reasonably believed that primary responsibility should lie with Fulton County DFCS; additionally, she would argue that it was not clearly established law that Gwinnett County DFCS was required to initiate these proceedings.

violated Maddox's procedural due process rights.  We nevertheless hold that Stephens is entitled to qualified immunity because she did not violate any clearly established substantive due process rights of which a reasonable state official in Stephens' shoes would have known during the pertinent time period.

We disagree with the district court that Stephens' conduct "lies so obviously at the very core of what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law."  See Loftus, 690 F.3d at 1205.  As discussed in depth above, in order for Maddox to show a substantive due process violation, Stephens' actions must be "characterized as arbitrary, or conscience shocking, in a constitutional sense."  Collins, 503 U.S. at 128, 112 S. Ct. at 1070.  Although Maddox cites Eleventh Circuit and Georgia Supreme Court cases for the proposition that procedural requirements should be followed when the State takes custody of the child, she has not cited any case that would make it clear to a reasonable social worker at the time that her actions were arbitrary or conscience shocking.

Maddox's arguments that procedural due process cases clearly established a substantive due process violation are unpersuasive.  None of the cases she cites come even remotely close to establishing that Stephens' actions, at the time she was making them, were so conscience shocking that it would be clear to a

32

reasonable state official that her conduct would violate Maddox's substantive due process rights.  See Loftus, 690 F.3d at 1204.  None of these cases, nor the provisions in the Georgia code, clearly provide for a situation where a party other than the State (the Hospital) has already released the child to the care of a third party (the grandmother).  As Stephens argues, she did not release the child to the father and the grandmother—it was the Hospital that released the child to the grandmother.  Stephens had advised the Hospital that neither she nor Gwinnett DFCS could authorize releasing the child to the father.  And, after finding out that the child was being discharged to the father and the grandmother, Stephens contacted Rae and, at Rae's direction, prepared the Safety Plan to make sure that the child would remain safe with the only family member qualified to care for her special needs.

Importantly—perhaps most importantly—it is clear and undisputed that the mother was not fit to take care of this child at any time before the discharge or even in the months after the discharge.  Given the fact that the child was to be released from the Hospital, and given the fact that the grandmother was undisputably the only family member qualified to take care of this child, we cannot hold that Stephens' actions violated Maddox's clearly established substantive due process rights.  Looking at the substance of what happened, the temporary placement of the

33

child with the grandmother was inevitable and it was clearly the most reasonable placement for the time being.  In fact, allowing the medically fragile child to be placed in the custody of an individual not qualified to care for her serious medical needs—here the mother—would have been unthinkable.  And this Court has previously held that "state officials who act to investigate or to protect children where there are allegations of abuse almost never act within the contours of 'clearly established law.'"  Foy, 94 F.3d at 1537.[18]  Given all of these circumstances, and even if Stephens' actions were not "textbook perfect," id. (quoting Manzano v. S.D. Dep't of Soc. Servs., 60 F.3d 505, 513 (8th Cir. 1995)), we must conclude that it would not be clear to a reasonable social worker that her conduct violated Maddox's substantive due process rights; stated another way, a reasonable social worker would not have been on notice that her behavior was "conscience shocking" or "arbitrary."  Even if we assume arguendo, although we expressly do not decide, that Stephens should have triggered court action within seven days of December 10, 2008, and even if we assume arguendo, although we expressly do not decide, that Stephens' actions violated Maddox's procedural due process rights,

---

[18]    We note that Foy involved allegations of abuse while this case does not concern such allegations.  However, because here the safety and health of the child was similarly at issue, we find Foy instructive as to whether a reasonable official would have known that her conduct violated Maddox's clearly established substantive due process rights.

34

we cannot conclude that the law was clearly established at the time of the relevant conduct that Stephens' actions were conscience shocking, and thus we cannot conclude that there has been a violation of clearly established substantive due process law.[19]  Accordingly, Stephens is entitled to qualified immunity on Maddox's substantive due process claim.

## IV.  CONCLUSION

"Substantive due process is a doctrine that has been kept under tight reins, reserved for extraordinary circumstances."  Nix v. Franklin Cnty. Sch. Dist., 311 F.3d 1373, 1379 (11th Cir. 2002).  Even conduct that is "untoward," "unfortunate," and "understandably upsetting" does not necessarily rise to the level of a substantive due process violation.  See Tinker v. Beasley, 429 F.3d 1324, 1329 (11th Cir. 2005) (quoting Luckes v. Cnty. of Hennepin, Minn., 415 F.3d 936, 940 (8th Cir. 2005)).  Here, we simply cannot hold that a reasonable social worker would have been on notice that her actions violated Maddox's substantive due process rights.  Accordingly, we reverse the denial of qualified immunity to Stephens on Maddox's substantive due process claim and remand for further proceedings not inconsistent with this opinion.

---

[19]    Because we hold that there has been no violation of clearly established substantive due process law, we need not decide whether Stephens' behavior actually violated Maddox's substantive due process rights.  See Pearson, 555 U.S. at 236, 129 S. Ct. at 818.

35

REVERSED AND REMANDED.