[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14407

_____

D.C. Docket No. 8:11-cv-02120-MSS-TGW

MARY E. WALTERS,

Plaintiff-Appellee,

versus

PAUL FREEMAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 16, 2014)

Before WILSON, PRYOR and ROSENBAUM, Circuit Judges.

PER CURIAM:

Officer Paul Freeman appeals the district court's denial of his motion for summary judgment seeking qualified immunity in this action under 42 U.S.C. § 1983. Freeman asserts that he is entitled to qualified immunity because exigent circumstances justified his warrantless entry into Plaintiff Mary E. Walters's home and his subsequent alleged use of force against her. Because, after careful review, we agree with the district court that no officer reasonably could have believed that exigent circumstances existed under the facts of this case viewed in the light most favorable to Walters, we affirm the district court.

## I.

On January 4, 2010, Howard Berk, the manager and part owner of the apartment building where Walters lived, called 911 and reported a "domestic between male/female." Freeman was dispatched to the scene. When he arrived, he found Berk and Peter Lacy in the parking lot, standing next to Lacy's van, with pots and pans on the ground.

Detective Jake Barlow arrived shortly thereafter to serve as Freeman's backup officer. Lacy informed Freeman that he had carried the pots out to the parking lot and had put them down there. He further explained that he and Walters had been drinking alcohol all day and having a good time until, at one point, she began yelling and screaming and demanding that Lacy leave. Barlow testified that he saw Freeman and Lacy discussing the fact that Walters had "kicked him out,

2

and that she was refusing to let him in to get his keys."  Barlow understood that what had transpired between Lacy and Walters "was simply [a] verbal argument."

Beyond the report of the argument and the alcohol consumption, neither Berk nor Lacy made any statement or suggestion that any physical altercation of any kind had occurred or that any emergency, injury, or threat of injury of any kind existed.  Nor was Freeman aware of any other evidence of a physical dispute or any other kind of potential emergency situation.

Nevertheless, Freeman testified, Lacy's statement that he and Walters had been drinking all day caused Freeman to think that this might be a Marchman Act situation.  The Marchman Act, Fla. Stat. § 397.675, allows the involuntary commitment of an individual if there is a good-faith reason to believe that she has lost self-control due to substance abuse and either may cause harm to herself or others or is need of substance-abuse services.

Therefore, Freeman stated, he approached Walters's door and, according to Berk, demanded that Walters "open this damn door" to talk about Lacy's keys. Through the closed door, Walters claimed not to have Lacy's keys.  Freeman later testified that, while standing at the door, he had no suspicion that a crime had occurred and no factual foundation for believing that Walters was subject to the Marchman Act.

3

Walters continued to refuse to open the door for the police, so, Freeman stated, he "obnoxiously bang[ed] on the door [and] rattl[ed] [the] windows, trying to annoy [Walters] so she'd come and open up the door." Later, Walters said, "If you want to have the keys, go get a fucking search warrant."

At this point, the stories diverge. According to Walters, twenty minutes after she last said anything to the officers through the door, Freeman "came busting in" the door. Walters further stated that she had her hands by her side, and Freeman grabbed her shoulders and threw her down on a futon, causing her to hit her head on the futon's metal frame.

For his part, Freeman claimed that before he even announced who he was, Walters shouted through the door, "Fuck you, get a search warrant," and repeated this statement continuously until he entered her apartment. But this interaction lasted only a couple of minutes, according to Freeman's testimony, before Berk informed Freeman that he had a spare key to the dwelling. Freeman used the key to unlock the door to Walters's apartment.

As he opened the door, Freeman testified, he saw Walters advancing towards him, "screaming hysterically," with her hands raised. In response, Freeman stated, he "instinctively" assumed a defensive posture and pushed Walters back into the apartment, where she fell backwards on to a futon that was near the door. Because Walters was kicking and screaming, Freeman claimed, he grabbed her wrists.

4

Both parties agree that Freeman handcuffed Walters after the incident and took her to the Venice jail, where she was charged with obstruction of justice.

## II.

Walters filed her complaint in state court against Freeman and the City of Venice, who, in turn, removed the case to the United States District Court for the Middle District of Florida. After Walters asked the district court to dismiss Venice with prejudice, the court granted her motion. Therefore, Venice is not a party to this appeal.

Walters's complaint asserted three counts against Freeman under § 1983, alleging violations of the Fourth Amendment for unlawful home entry (Count I), unlawful home search (Count II), and excessive force (Count III).[1] Freeman moved for summary judgment on all counts, invoking the defense of qualified immunity. The district court denied Freeman's motion, finding that "material issues of fact exist concerning whether exigent circumstances warranted a warrantless entry and arrest" and "whether the use of force against [Walters] was reasonable because 'if an arresting officer does not have the right to make an

---

[1] Walters originally asserted each of the counts against Freeman in both his official and individual capacities. The district court entered summary judgment for Freeman as to the claims against him in his official capacity because official-capacity claims are construed as claims against the government entity by whom the officer is employed, and § 1983 claims against governmental entities must challenge an official policy or custom of the entity; they may not proceed on a respondeat superior basis. *See Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir. 1989).

arrest, he does not have the right to use any degree of force in making that arrest.'" This appeal followed.

## III.

We have jurisdiction to hear appeals from "all final decisions of the district courts of the United States . . . ."  28 U.S.C. § 1291.  A district court's denial of a qualified-immunity claim is a "final decision" under Section 1291, to the extent that it turns on an issue of law.  *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985).  Consequently, we have jurisdiction to hear Freeman's appeal.

We review de novo the district court's denial of qualified immunity on a motion for summary judgment.  *Wilkerson v. Seymour*, 736 F.3d 974, 977 (11th Cir. 2013).  Summary judgment should be entered when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making this determination, we consider the record and draw all reasonable inferences in the light most favorable to the Walters, the non-moving party.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (per curiam) (citation omitted).

## IV.

The qualified-immunity defense aims to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they

perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009). Towards that end, qualified immunity protects government officials engaged in discretionary functions and sued in their individual capacities unless they "violate[] clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2013) (internal quotation marks omitted). Because qualified immunity "is an immunity from suit rather than a mere defense to liability," the Supreme Court has emphasized the importance of determining questions of immunity at the earliest possible juncture in the case. *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994) (internal quotation marks and emphasis omitted).

Under the qualified-immunity doctrine, a public official must first show that he was acting within the scope of his discretionary authority. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). Here, Freeman undisputedly has established this fact.

The burden then shifts to Walters to demonstrate that qualified immunity is not appropriate. *See id.* In order to do this, Walters must show that, when viewed in the light most favorable to her, the facts demonstrate that Freeman committed a violation of Walters's constitutional right and that that right was "clearly established . . . in light of the specific context of the case, not as a broad general

proposition[,]" at the time of Freeman's actions. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2156 (2001). We may decide these issues in either order, but, to survive a qualified-immunity defense, Walters must satisfy both showings.[2] *Maddox*, 727 F.3d at 1120−21.

## A.

Here, we start with the question of whether Walters's factual allegations, assumed for the purposes of this inquiry to be true, demonstrate a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513 (2002). Walters claims that Freeman entered her apartment without a warrant and used excessive force against her once inside. She asserts that Freeman's actions violated her Fourth Amendment rights.

Freeman responds that no constitutional violation occurred because the possibility that Walters was a victim of domestic abuse or a candidate for involuntary commitment under the Marchman Act created emergency circumstances that justified his warrantless entry. The law does not support Freeman's position.

---

[2] Although the Supreme Court originally determined that a court must first answer the question of whether a constitutional right was violated before proceeding to the issue of whether the right was clearly established, in *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 810 (2009), the Court abrogated that requirement and held that courts may conduct the inquiry in either order.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.  Under the Fourth Amendment, warrantless searches inside a home are "presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947 (2006) (internal quotation marks omitted).

Limited exceptions to this rule exist, however.  Among others, the "emergency aid" exception permits officers to make a warrantless entry into a home to provide emergency assistance to a seriously injured person inside or to protect an occupant from "imminent injury." *Kentucky v. King*, ___ U.S. ___, 131 S. Ct. 1849, 1856 (2011) (internal quotation marks omitted).  Because Freeman had no warrant, he invokes this exception to justify his entry into Walters's home.  The record, however, properly construed with all inferences drawn in Walters's favor, does not support a conclusion that an emergency meriting Freeman's warrantless entry existed.

Freeman was dispatched to the scene of a domestic disturbance between a male and female.  When he arrived on the scene, the parties were separated and not interacting: Lacy was in the parking lot, and Walters was inside her own home, behind her locked door.  No report of any physical altercation had been made, nor had Freeman received any reports of noises or other circumstances that might

9

suggest that a physical altercation had taken place.  Freeman had no evidence of criminal activity or violence, only a verbal dispute concerning Lacy's keys.  As we have said before, the emergency-aid exception requires "indicia of an urgent, ongoing emergency" such as when "officers have received emergency reports of an ongoing disturbance, [and] arrived to find a chaotic scene, and observed violent behavior, or at least evidence of violent behavior."  *United States v. Timmann*, 741 F.3d 1170, 1179 (11th Cir. 2013).  Here, Freeman encountered none of these circumstances.

Freeman points out that domestic disputes often degenerate into violent confrontations and argues that warrantless entries can be justified in domestic-disturbance situations.  For example, Freeman cites *Tierney v. Davidson*, 133 F.3d 189 (2d Cir. 1998), where the Second Circuit found a warrantless entry to be appropriate.  In *Tierney*, the police were summoned to "a 'bad' domestic dispute," described as "the worst yet," at a residence where previous domestic disturbances had occurred.  *Id.* at 192.  On arrival, the police encountered a broken glass pane but could not locate the occupants of the home who had been fighting.  *Id.*  The Second Circuit found the entry to be justified under these circumstances because it was reasonable to believe "that someone inside had been injured or was in danger, [and] that both antagonists remained in the house."  *Id.* at 197.  But *Tierney* is inapposite because Freeman had no evidence of previous disputes between Walters

10

and Lacy, they were safely separated when Freeman arrived, and Freeman was aware of no signs of any violence.

Freeman's reliance on similar cases is also misplaced because, like *Tierney*, each of the other cases cited possessed indicia of an urgent, ongoing emergency not found here. *See United States v. Brooks*, 367 F.3d 1128, 1135−36 (9th Cir. 2004) (sounds of a woman being beaten and the parties were still co-located in a hotel room); *Fletcher v. Town of Clinton*, 196 F.3d 41, 51 (1st Cir. 1999) (police spotted boyfriend inside home of, and in the same room with, a woman who had taken out a restraining order against the boyfriend, who police knew had committed prior violent acts); *Anderson v. City of West Bend Police Dep't*, 774 F. Supp. 2d 925, 939 (E.D. Wis. 2011) (sounds of furniture moving, things banging around, and a woman saying "help me;" woman crying and leaving impression that she would return to speak with police but then failing to return after she went back inside with her alleged abuser); *United States v. Lawrence*, 236 F. Supp. 2d 953, 961−62 (D. Neb. 2002) (woman spoke to 911 dispatcher with "tearful, hesitant, or frightened voice"; husband and wife fighting with each other during 911 calls; abrupt hang up of 911 calls; and no contact with wife after police arrived on scene while angry husband told wife that police would not be allowed inside).

Freeman also contends that Florida's "robust" domestic abuse investigation-and-reporting statute essentially required him to do whatever was necessary to

11

visually verify and confirm Walters's well-being after being dispatched to a domestic-disturbance call.  *See* Fla. Stat. § 741.29.

This argument is unavailing.  Although Florida's statute imposes mandatory investigation obligations on law enforcement officials, *see* Fla. Stat. § 741.29(1), (2), it does so with respect to incidents of "domestic violence."  *Id.*  The Florida statute's definition of "domestic violence" encompasses a wide-array of *physical* conduct.  *See* Fla. Stat. § 741.28.  Freeman, however, did not encounter any evidence of physical violence, and the Florida statute did not impose any obligations on Freeman that justified a warrantless entry into Walters's home under the facts of this case.

Freeman's other argument for why his warrantless entry was proper—that he believed a Marchman Act situation existed—is also unpersuasive.  Freeman himself testified that he had no factual basis, including no first-hand proof of Walters's intoxication, to support his belief that Walters was subject to the Act at the time that he entered the apartment without a warrant.  While the evidence may support an objectively reasonable conclusion that Walters was intoxicated to some degree (which Walters denies), it does not support a conclusion that she was so

dangerously intoxicated that either she was suffering a health emergency or had lost self-control and was a suitable candidate for Marchman Act commitment.[3]

Walters also alleges that Freeman violated her Fourth Amendment rights by using excessive force during the encounter.  Because the facts viewed in the light most favorable to Walters demonstrate that Freeman's entry into her apartment was unlawful, we must also conclude that they support finding a constitutional excessive-force violation.  As we have stated, "if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making the arrest."  *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006).

Therefore, viewing the facts in the light most favorable to Walters, we conclude that the district court did not err in finding that Freeman violated her Fourth Amendment rights with respect to the warrantless entry and search of her home as well as with regard to Freeman's use of excessive force during the encounter.

**B.**

We now examine whether the law was clearly established at the time of the incident.  The violation of a constitutional right is clearly established if a

---

[3] Freeman mentions in passing a concern that Walters may have been a candidate for involuntary commitment or admission under the Baker Act, Fla. Stat. § 394.463(1).  This argument is without merit.  There is no evidence on the record that Freeman had any reason to believe that Walters satisfied the Baker Act criteria at the time he entered her apartment.

13

reasonable official would understand that his conduct violates that right. *See Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). Our Circuit employs two methods to make this determination. *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011). In the first, "[w]e have held that decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law." *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007). Under this method, "[e]xact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from the pre-existing law." *See Coffin*, 642 F.3d at 1013.

The second method involves evaluating the officer's conduct and deciding whether the officer's "conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the law of fact-specific case law" on point. *Fils*, 647 F.3d at 1291 (alteration in original) (internal quotation marks omitted). Thus, despite an absence of case law holding the specific conduct to be unlawful, a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Coffin*, 642 F.3d at 1014−15; *see Fils*, 647 F.3d at 1291.

14

With the facts construed most favorably to Walters, we find that it was clearly established at the time of the incident—under either method—that Freeman's conduct violated Walters's right to be secure in her home from warrantless, unconsented, and unjustified police intrusions. *See Payton v. New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 1379 (1980) ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (internal quotation marks omitted)); *Bashir*, 445 F.3d at 1331 (entering a home "without a warrant, exigent circumstances, or consent" violates "clearly established" Fourth Amendment precedent); *Riggs v. State*, 918 So. 2d 274, 278−79 (Fla. 2005) (recognizing that warrantless entry into a home without "the sort of emergency or dangerous situation, described in our cases as 'exigent circumstances,'" is unjustified (internal quotation marks omitted)).

Moreover, the contours of the emergency-aid exception to the warrant requirement were clearly established at the time of the incident.  In *Stuart*, for example, in 2006, the Supreme Court plainly explained the limitations on the emergency-aid exception:  "[L]aw enforcement officers may enter a home without a warrant to render *emergency assistance* to an injured occupant or to protect an occupant from *imminent* injury."  *See Stuart*, 547 U.S. at 403, 126 S. Ct. at 1947 (emphasis added).  Similarly, we said in *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002), "[E]mergency situations involving *endangerment to life* fall

15

squarely within the exigent circumstances exception. . . . When the police reasonably believe an emergency exists which calls for an *immediate* response to protect citizens from *imminent danger*, their actions are no less constitutional." (emphasis added). Florida has also previously spoken clearly to the issue. In *Riggs*, 918 So. 2d at 278, Florida's Supreme Court explained, "To [invoke the exigent-circumstances exception, the government] must demonstrate a *grave emergency* that makes warrantless search *imperative* to the safety of the police and of the community." (Emphasis added) (internal quotation marks omitted).

When Freeman opened Walters's door, there was no evidence of a crime. There was no evidence of violence. There was no evidence of existing injury or imminent harm. There was no evidence of dangerous intoxication warranting Marchman Act intervention. So there was no basis under any of the case law to warrant a reasonable officer's belief that the emergency-aid exception to the Fourth Amendment's warrant requirement might apply. Instead, a reasonable officer faced with these circumstances would have fair and clear warning that a warrant was required for entry into Walters's home. And similarly, it was clearly established at the time of the incident that any force used in support of Freeman's unlawful conduct was excessive. *See Zivojinovich v. Barner*, 525 F.3d 1059, 1071 (11th Cir. 2008) ("[E]ven de minimis force will violate the Fourth Amendment if

16

the officer is not entitled to arrest or detain the suspect . . . ."); *Bashir*, 445 F.3d at 1332.

## V.

Because the facts, viewed in the light most favorable to Walters, demonstrate that Freeman violated her clearly established constitutional rights, the district court properly denied qualified immunity to Freeman. For these reasons, the district court's order is **AFFIRMED**.