RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0133p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DAILY SERVICES, LLC,

                    *Plaintiff-Appellant,*

   *v.*

TRACY VALENTINO; TINA KIELMEYER; TOM SICO; JOHN DOES, NOS. 1 THROUGH 5, Employees of the Ohio Bureau of Workers' Compensation,

                    *Defendants-Appellees.*

No. 13-4157

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:11-cv-01147—Elizabeth A. Preston, Magistrate Judge.

Argued: May 7, 2014

Decided and Filed: June 26, 2014

Before: MOORE and COLE, Circuit Judges; DRAIN, District Judge.[*]

---

**COUNSEL**

**ARGUED:** W. Evan Price II, LAW OFFICE OF W. EVAN PRICE II, LLC, Dublin, Ohio, for Appellant. James A. King, PORTER, WRIGHT, MORRIS & ARTHUR LLP, Columbus, Ohio, for Appellees. **ON BRIEF:** W. Evan Price II, LAW OFFICE OF W. EVAN PRICE II, LLC, Dublin, Ohio, for Appellant. James A. King, David S. Bloomfield, Jr., Caitlin E. Chamberlin, PORTER, WRIGHT, MORRIS & ARTHUR LLP, Columbus, Ohio, for Appellees.

COLE, J., delivered the opinion of the court, in which DRAIN, D.J., joined and in which MOORE, J., joined except as to Part II.C.3. MOORE, J. (pp. 23–24), delivered a separate opinion dissenting in part.

---

[*]The Honorable Gershwin A. Drain, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

---

**OPINION**

---

COLE, Circuit Judge.  Daily Services, LLC sued various employees of the Ohio Bureau of Workers' Compensation after the Bureau filed a series of judgments and liens against the company in violation of Ohio's statutory and administrative procedures.  Daily Services claimed that the defendants violated its right to procedural due process.  The district court concluded that the defendants were entitled to qualified immunity.  The court recognized that *Parratt v. Taylor*, 451 U.S. 527 (1981), and its progeny sometimes allow a state to satisfy due process without providing notice or an opportunity to be heard before depriving a property interest.  Because it was not clearly established that *Parratt* did not apply, the court reasoned, Daily Services did not have a clearly established right to predeprivation process.

We find the district court's conclusion in error because the applicability of *Parratt* is irrelevant to the "clearly established" prong of the qualified immunity analysis.  Nevertheless, because the *Parratt* doctrine does apply, and Daily Services has not pleaded that Ohio provided inadequate postdeprivation remedies, we affirm the district court's decision granting the defendants' motion for judgment on the pleadings.

## I.  BACKGROUND

Because the defendants moved for judgment on the pleadings, this court accepts the complaint's well-pleaded factual allegations as true and construes the complaint in the light most favorable to Daily Services.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Daily Services provides short-term temporary employment services in central Ohio.  The company's sole member is Ryan Mason.  Mason was also the sole member of I-Force, LLC, a company that provided longer-term temporary employment services.  After losing coverage under the Bureau's group insurance rating plan, I-Force applied with the Bureau for self-insurance status.  The Bureau denied the application, and I-Force owed over $3 million in unpaid workers' compensation premiums.  Unable to make payments towards the premiums, I-Force

closed.  Daily Services acquired some of I-Force's customers and began offering longer-term temporary employment services.

Ohio law allows the Bureau to recover unpaid premiums by filing judgments and liens against delinquent employers.  *See* Ohio Rev. Code Ann. §§ 4123.37, 4123.78; Ohio Admin. Code § 4123-14-02.  Under this administrative process, the Bureau first must provide the employer with written notice of the overdue premiums and an opportunity to pay the premiums within twenty days.  *See* Ohio Rev. Code Ann. § 4123.37.  If the employer does not pay within twenty days, the Bureau must provide an "assessment" by certified mail.  *Id.*  The assessment becomes final twenty days later, unless the employer petitions for reassessment, at which point the Bureau's administrator must issue findings and an order.  *Id.*  The employer may appeal the administrator's findings and order to the Franklin County Court of Common Pleas.  *Id.*  Once the assessment is final, the Bureau may file a judgment with the state court and a lien with the county recorder.  *See id.* §§ 4123.37, 4123.78.  Ohio law, in other words, provides the employer with notice and an opportunity to be heard before the Bureau may file a judgment or lien against it.

Ohio law also allows the Bureau to deem one company the successor of another for purposes of the workers' compensation laws.  *See id.* § 4123.32(C); Ohio Admin. Code § 4123-17-02(B) & (C).  The Bureau may transfer a prior employer's experience rating, which is used to calculate premiums, and, if an employer "wholly succeeds another in the operation of a business," the Bureau may transfer the obligation to pay unpaid premiums.  *See* Ohio Admin. Code § 4123-17-02(B).

In May 2009, the Bureau decided internally that Daily Services wholly succeeded I-Force, and it began a quest to recover I-Force's unpaid premiums from Daily Services.  We need not detail the lengthy procedural history between the Bureau and Daily Services here.  In relevant part, the Bureau did not provide notice of its assessment via certified mail or an opportunity to be heard, in violation of Ohio law, before it filed the following judgments and liens against Daily Services: a $54 million lien and a $54 million judgment on November 6, 2009; a $22 million lien on November 17; a $3 million lien on July 8, 2010; and a $3 million judgment on July 13.

Daily Services moved in state court to vacate the judgments in September 2010. Because the Bureau had not provided prior notice, the state court vacated the $3 million judgment in October 2010 and the $54 million judgment in February 2011. Ten days later, the Bureau released the three liens. That same day, however, the Bureau filed another $3 million lien and another $3 million judgment against Daily Services. This time the Bureau provided prior notice of its assessment, but it filed the lien and judgment before the Bureau's administrator heard Daily Services' appeal of the assessment.

Daily Services again moved in state court to vacate the judgment. In November 2011, the state court vacated the second $3 million judgment because the assessment was not "final" in light of the pending administrative appeal. Four days later, on November 25, the Bureau filed an $8,400 lien against Daily Services based on its yet-to-be-issued decision that four other companies owned by Mason should be "combined" with Daily Services into one workers' compensation policy. The Bureau did not provide notice of its decision before filing the lien. Daily Services appealed the Bureau's decision, but while the appeal was pending the Bureau filed an $8,400 judgment against Daily Services on December 12. About six weeks later, after Daily Services filed the instant complaint, the Bureau dismissed the judgment and released the lien. The Bureau has not released the second $3 million lien. The parties are still litigating whether Daily Services wholly succeeded I-Force.

Daily Services sued Tracy Valentino, Chief Financial Officer of the Bureau; Tom Sico, Assistant General Counsel of the Bureau; Tina Kielmeyer, the Bureau's Chief of Customer Service; and five unknown Bureau employees, all in their individual capacities, under 42 U.S.C. § 1983. Daily Services alleged that the defendants violated its Fourteenth Amendment right to procedural due process nine times—one count for each judgment and lien. According to Daily Services, these judgments and liens prevented it from securing conventional financing, causing Daily Services to incur excess interest and hindering the company's ability to expand. Daily Services sought over $1 million in damages. Daily Services also claimed that the defendants acted intending to shut down Daily Services, in part because Valentino is a close friend of the owner of one of Daily Services' competitors.

The defendants answered the complaint and moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). The district court granted the motion. It concluded that the defendants were entitled to qualified immunity because the law did not clearly establish that Daily Services was entitled to notice and an opportunity to be heard before the judgments and liens were filed. Daily Services timely appealed.

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343, and 28 U.S.C. § 636(c) gave the magistrate judge authority to decide the case. This court has jurisdiction under 28 U.S.C. §§ 636(c)(3) and 1291.

## II. ANALYSIS

This court reviews de novo a decision dismissing an action under Federal Rule of Civil Procedure 12(c). *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). We evaluate a Rule 12(c) motion for judgment on the pleadings as we would a Rule 12(b)(6) motion to dismiss. *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511–12 (6th Cir. 2001). To survive the Rule 12(c) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

This court also reviews de novo the district court's finding of qualified immunity. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998). To determine whether state officials are entitled to qualified immunity, we generally ask two questions: whether the plaintiff has alleged facts that make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of the misconduct. *See Santiago v. Ringle*, 734 F.3d 585, 593 (6th Cir. 2013). The court may address either question first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### A. Mootness

As an initial matter, the defendants argue that this case is moot because the state court vacated all but one of the judgments and the Bureau released the liens and remaining judgment against Daily Services. A case becomes moot, depriving federal courts of jurisdiction, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the

outcome." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). "But a case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012)). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox*, 132 S. Ct. at 2287 (quoting *Ellis v. Railway Clerks*, 466 U.S. 435, 442 (1984)) (internal quotation marks and brackets omitted).

Daily Services' federal complaint seeks compensatory and punitive damages caused by the judgments and liens, not simply release from the judgments and liens. The damages claim alone keeps this case alive. *See Deakins v. Monaghan*, 484 U.S. 193, 201–02 (1988) (concluding that the Court had jurisdiction to address the plaintiffs' claims for damages and attorney's fees even where their equitable claims were moot). Indeed, a claim for damages "remains live until it is settled, judicially resolved, or barred by a statute of limitations." *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1531 (2013). None of these three scenarios applies here. It is possible for the court to grant effectual relief on Daily Services' damages claim; Daily Services has a concrete interest in the outcome of this litigation. The case, therefore, is not moot. *See Chafin*, 133 S. Ct. at 1023; *Knox*, 132 S. Ct. at 2287.

The defendants ignore this classic analysis, instead relying on *Campbell v. City of Allen Park*, 829 F.2d 576 (6th Cir. 1987), *WJW-TV, Inc. v. City of Cleveland*, 878 F.2d 906 (6th Cir. 1989) (per curiam), and *Braley v. City of Pontiac*, 906 F.2d 220 (6th Cir. 1990). These cases are unavailing.

*Campbell* relied solely on *Punton v. City of Seattle*, 805 F.2d 1378 (9th Cir. 1986), to conclude that a plaintiff's success in a prior state court proceeding rendered moot her federal constitutional claim for additional money damages. *See Campbell*, 829 F.2d at 578–80. In *Campbell*, a fired city employee sued the city in federal court under § 1983, seeking reinstatement, back pay, damages for emotional distress, and attorney's fees. *Id.* at 578. She also appealed her discharge in state court. *Id.* The state court awarded back pay, and the city reinstated her. *Id.* The federal court then dismissed the § 1983 action, and our court affirmed. *Id.* at 577–78. "The constitutionality of [the employee's] discharge became moot once she was

restored to her job with a judgment for back pay," this court concluded, and "[i]n light of *Punton*," the claim for attorney's fees and additional damages did not keep the employee's case alive. *Id.* at 580. *Punton*, however, appeared to rely on the doctrines of claim preclusion and election of remedies. 805 F.2d at 1381–82. Neither doctrine bears on the question of mootness. Moreover, the Ninth Circuit later overruled *Punton* to the extent it rested on the election of remedies doctrine. *Haphey v. Linn Cnty.*, 953 F.2d 549, 551–52 (9th Cir. 1992) (en banc). *Campbell*'s mootness conclusion resides on dubious ground and thus has little continuing precedential value.

*WJW-TV*, too, does not help the defendants. That case's holding does not apply where a plaintiff seeks additional damages in federal court. *See WJW-TV*, 878 F.2d at 908. In *WJW-TV*, the plaintiff TV station sought in federal court injunctive relief and attorney's fees, but not damages. *See id.* A state court later awarded, to another plaintiff, precisely the same injunctive relief the TV station sought in federal court. *Id.* at 908–09. The state case arose from the "identical facts" presented in *WJW-TV* and resolved "identical controversies." *Id.* at 908, 910. Under those unique circumstances, we found the TV station's federal claim moot. *Id.* at 909–10. But *WJW-TV* does not apply where, as here, the plaintiff seeks damages not sought in state court.

*Braley* is also inapplicable. There, a plaintiff filed suit in federal court alleging a § 1983 violation and three pendant state-law claims. *Braley*, 906 F.2d at 222. The district court dismissed the three state-law claims without prejudice, and the plaintiff filed a separate complaint in state court based on those three claims. *Id.* He recovered damages in state court on two of the claims. *Id.* The federal court then dismissed the § 1983 suit, and our court affirmed, holding that the plaintiff did not state an underlying constitutional claim. *Id.* at 222, 224. This court also explained its view that "once [the plaintiff] obtained substantial satisfaction of his underlying claim in state court, the federal issue . . . became moot." *Id.* at 223. The court wrote that "[a] supplemental § 1983 action is available where it seeks to vindicate a constitutional right that was not adequately vindicated by the state law action." *Id.*

We conclude that this take on mootness and the availability of a § 1983 action, expressed in dicta, is not viable. First, the *Braley* court's mootness reasoning relied heavily on *Campbell*, which itself rested on dubious and subsequently overruled grounds. *See Braley*, 906 F.2d at

223–24; *see also Campbell*, *supra*.    Second, wholly absent from *Braley*'s reasoning is the analysis typically used to assess mootness issues, including in § 1983 cases.  *See, e.g., Knox*, 132 S. Ct. at 2287; *Alvarez v. Smith*, 558 U.S. 87, 92–94 (2009); *Deakins*, 484 U.S. at 199–202. Third, the reasoning asks far too much of *Parratt v. Taylor*, 451 U.S. 527 (1981).  *Parratt* bears on the viability of a procedural due process claim.  *See* 451 U.S. at 543–44.  *Parratt* does not, as the *Braley* court indicated, limit the availability of a § 1983 action itself, regardless of the underlying constitutional claim.    Such reasoning improperly "confuses mootness with the merits." *Chafin*, 133 S. Ct. at 1024.  It also collides with the well-established principles that a plaintiff may maintain a § 1983 action without exhausting state judicial remedies, *Monroe v. Pape*, 365 U.S. 167, 183 (1961), or state administrative remedies, *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982).  And, in any event, *Braley* does not apply where, as here, the plaintiff did not seek damages in state court.

## B.       Qualified Immunity's Clearly Established Law and *Parratt*

Our qualified immunity analysis first addresses the sole basis for the district court's decision: whether Daily Services' claimed constitutional right was "clearly established."   A constitutional right is clearly established where its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right"—in other words, where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).  An action's unlawfulness must be apparent in light of pre-existing law, but the very action in question need not previously have been held unlawful.  *Anderson*, 483 U.S. at 640. Indeed, "an action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs."   *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012).

The district court granted qualified immunity because of uncertainty about whether the *Parratt* doctrine applies in this case.  To prevail on its due process claim, the court explained, Daily Services must show that its claimed right to predeprivation process was clearly established. The court recognized that, under the *Parratt* doctrine, a state need not provide predeprivation process so long as it provides adequate postdeprivation remedies.  The court then reasoned by

this logic: Daily Services' right to predeprivation process exists only if the *Parratt* doctrine does not apply; it was uncertain, and therefore not clearly established, that the *Parratt* doctrine does not apply; thus, it was not clearly established that Daily Services had a right to predeprivation process. Under this formalist approach, the court granted the defendants qualified immunity.

The district court's analysis erroneously fuses qualified immunity and *Parratt*, two doctrines that should remain separate because they limit liability for different reasons. The qualified immunity doctrine seeks to balance two competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. At its core, qualified immunity "acts to safeguard government, and thereby to protect the public at large, not to benefit its agents." *Wyatt v. Cole*, 504 U.S. 158, 168 (1992). The doctrine embodies "the importance of a damages remedy to protect the rights of citizens," for where a government official abuses her office, "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 814 (1982). But the doctrine also recognizes that, when officials reasonably act in areas where the law is not clearly established, reducing their fear of being sued by protecting them from damages liability better serves the public interest. *See id.* at 819. The "clearly established" prong exists to allow officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Davis v. Scherer*, 468 U.S. 183, 195 (1984).

The *Parratt* doctrine, in contrast, asks whether the state is responsible under the Due Process Clause for its employee's misconduct. If an official's conduct would otherwise deprive an individual of procedural due process but is "random and unauthorized," the *Parratt* doctrine allows the state to avoid liability by providing adequate remedies after the deprivation occurs. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984). The key inquiry is "whether the state is in a position to provide for predeprivation process." *Id.* at 534. If not—because the official's conduct is random and unauthorized—the state is responsible for the official's misconduct only if it does not provide adequate postdeprivation remedies. *See Brooks v. George Cnty., Miss.*, 84 F.3d 157, 165 (5th Cir. 1996) ("The doctrine is meant to protect the state from liability for

failing to provide predeprivation process in situations where it cannot anticipate the need for such process (when actions are random and unauthorized).").

In other words, qualified immunity prevents personal liability in order to allow officials to act in the public interest where the law is not clearly established. The *Parratt* doctrine prevents liability in order to allow the state to avoid responsibility for denying process it cannot reasonably be expected to provide. *See Zinermon v. Burch*, 494 U.S. 113, 128, 129 (1990).

The applicability of *Parratt*, then, is irrelevant to the clearly established prong of the qualified immunity analysis. As a colleague on our sister circuit noted, "Granting immunity based on the lack of clarity as to whether the *State* bears responsibility would turn the qualified immunity doctrine on its head. The official would in effect be seeking immunity based on a 'reasonable' belief that his conduct was so wrong—i.e., it was 'random and unauthorized'—that it could not provide the basis for a procedural due process claim." *San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá*, 687 F.3d 465, 500 (1st Cir. 2012) (en banc) (Lipez, J., concurring). Qualified immunity exists to shield actions reasonable in light of current law without protecting abuses of office. *See Anderson*, 483 U.S. at 638, 646. It would undermine that doctrine's purpose to find a due process violation but provide no remedy because the defendant could have thought that *Parratt* would let him (and the state) off the hook for his violation of clearly established due process law. *San Gerónimo*, 687 F.3d at 500 (Lipez, J., concurring).

Indeed, the Supreme Court has never looked to the *Parratt* doctrine when assessing whether a defendant deserves qualified immunity because the claimed procedural due process right was not clearly established. Nor has our court ever held that uncertainty about whether *Parratt* applies gives rise to qualified immunity. At times, in fact, we have suggested the opposite. *See, e.g.*, *Silberstein v. City of Dayton*, 440 F.3d 306, 315–18 (6th Cir. 2006) (finding the plaintiff's right to procedural due process violated in part because the *Parratt* doctrine did not apply and, without reference to *Parratt*, finding the right clearly established); *Thomas v. Cohen*, 304 F.3d 563, 579–81 (6th Cir. 2002) (same); *Rodgers v. 36th Dist. Ct.*, 529 F. App'x 642, 649–51 (6th Cir. 2013) (denying qualified immunity by concluding, "[a]fter an extensive survey of this court's sometimes contradictory precedent," that the *Parratt* doctrine did not apply, and that the plaintiff's right to procedural due process was clearly established).

Some of our sister circuits and other courts also have suggested that uncertainty about the *Parratt* doctrine does not affect the "clearly established" inquiry.  *See, e.g., Bailey v. Pataki*, 708 F.3d 391, 404–08 (2d Cir. 2013) (finding, after lengthy discussion, a procedural due process violation because the *Parratt* doctrine did not apply, and denying qualified immunity because the due process right was clearly established); *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 821–23 (5th Cir. 2007) (reversing the district court's decision that the *Parratt* doctrine applied, and denying qualified immunity because the plaintiff had a clearly established right to predeprivation process); *Amsden v. Moran*, 904 F.2d 748, 752, 756–57 (1st Cir. 1990) (assuming that "plaintiff's entitlement to due process was 'clearly established,'" but granting qualified immunity because the *Parratt* doctrine applied); *Merritt v. Mackey*, 827 F.2d 1368, 1372–73 (9th Cir. 1987) (reversing the district court's decision that the *Parratt* doctrine applied, and denying qualified immunity because the plaintiff had a clearly established right to predeprivation process); *Roach v. City of New York*, No. 88-cv-5234, 1992 WL 176944, at *4 (S.D.N.Y. July 10, 1992) (denying qualified immunity where defendant did not follow state predeprivation procedures, and noting that "[w]hether or not Defendant's actions were 'random and unauthorized' in this case . . . is a different question from whether Defendant is entitled to qualified immunity").

A handful of other cases have discussed the *Parratt* doctrine while assessing whether the claimed procedural due process right was clearly established, but none have examined whether the *Parratt* doctrine is properly part of the clearly established law inquiry in the first place.  *See, e.g., Clement v. City of Glendale*, 518 F.3d 1090, 1096 (9th Cir. 2008) (granting qualified immunity because the officer reasonably could have thought *Parratt* and other case law would allow him to tow an unregistered vehicle without first notifying its owner); *Powell v. Georgia Dep't of Human Res.*, 114 F.3d 1074, 1082–83 (11th Cir. 1997) (granting qualified immunity because it was not clearly established that additional predeprivation procedures were feasible, and thus the *Parratt* doctrine applied); *Coriz v. Martinez*, 915 F.2d 1469, 1470–71 (10th Cir. 1990) (granting qualified immunity because of uncertainty about the adequacy of postdeprivation remedies under *Parratt*, though "conced[ing] that this is an unusual application of qualified immunity"); *Birkenholz v. Sluyter*, 857 F.2d 1214, 1218 (8th Cir. 1988) (granting qualified immunity because a reasonable officer could have believed that state law provided adequate

postdeprivation remedies under *Parratt*).   These cases therefore fail to provide meaningful guidance on the question before us.

Thus, while courts may consider the *Parratt* doctrine to determine whether the plaintiff has alleged a procedural due process violation, courts should not consider the *Parratt* doctrine to determine whether the due process right at issue was clearly established.   The doctrine simply has no place in assessing whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau*, 543 U.S. at 198–99.

Here, the district court erred when it granted qualified immunity based on its understanding that the law "is unsettled as to whether the failure of a public official to follow established procedure constitutes 'random and unauthorized' conduct, thereby triggering *Parratt*."   Simply put, the court focused on the clarity of the wrong law.   The inquiry is not whether a reasonable official would understand that his wrongful denial of predeprivation process might not ultimately amount to a due process violation by the state under the *Parratt* doctrine.   Rather, in the context of this procedural due process claim, the "clearly established law" inquiry should ask whether a reasonable official would understand that the plaintiff was entitled to notice and an opportunity to be heard before the official filed a judgment or lien against the plaintiff.   *See Silberstein*, 440 F.3d at 316 ("[T]he inquiry over whether a constitutional right is 'clearly established' must be undertaken in light of the specific context of the case, not as a broad general proposition.").

At the time of the defendants' actions, it was clearly established that "even the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection." *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991).   As the Supreme Court stated many years ago, "the root requirement" of due process protection is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)) (internal quotation marks omitted).   Indeed, "[t]he right to prior notice and a hearing is central to the Constitution's command of due process." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993).   "We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in

extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Id.* (quoting *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972)) (internal quotation marks omitted). Ohio law recognizes these requirements by requiring the Bureau and its employees to provide notice and an opportunity to be heard before filing a judgment or lien for unpaid premiums. *See, e.g.*, Ohio Rev. Code Ann. § 4123.37; Ohio Admin. Code § 4123-14-02.

It is well-established and unassailable that "a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 819. Thus, if Daily Services has alleged facts that make out a violation of its constitutional right to predeprivation process, discussed *infra*, the only basis for qualified immunity would be the defendants' reasonable uncertainty about whether the circumstances presented "extraordinary situations where some valid governmental interest" justified postponing notice or the opportunity to be heard until after the deprivation. *See James Daniel Good*, 510 U.S. at 53. The facts of this case present no such uncertainty. Reasonable officials in the defendants' positions would know that predeprivation process—notice and an opportunity to be heard—was required before filing the judgments and liens against Daily Services.

### C.      Procedural Due Process Violation

Though clearly established in this specific context, Daily Services' right to procedural due process has not been violated. States may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This clause has a procedural component, which "is traditionally viewed as the requirement that the government provide a 'fair procedure' when depriving someone of life, liberty, or property." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). To establish a procedural due process claim, a plaintiff must show that (1) it had a life, liberty, or property interest protected by the Due Process Clause; (2) it was deprived of this protected interest; and (3) the state did not afford it adequate procedural rights. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). The defendants do not contest that Daily Services' complaint sufficiently alleges the first two elements, so we address only the third.

1.      *The* Parratt *doctrine*

The Federal Constitution defines the procedures a state must follow when depriving an individual of a property interest.  *Loudermill*, 470 U.S. at 541.   "Procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest."  *Warren v. City of Athens, Ohio*, 411 F.3d 697, 708 (6th Cir. 2005).  Ohio law recognizes these requirements.  Before the Bureau may file a judgment or lien for unpaid premiums, thereby depriving an individual of a property interest, Ohio law requires the Bureau to provide notice and an opportunity to be heard.  *See, e.g.*, Ohio Rev. Code Ann. § 4123.37; Ohio Admin. Code § 4123-14-02.

Under certain circumstances, however, a state may satisfy due process without providing notice or an opportunity to be heard before the deprivation.   Three cases stake the main guideposts of this notorious doctrine: *Parratt v. Taylor*, 451 U.S. 527 (1981); *Hudson v. Palmer*, 468 U.S. 517 (1984); and *Zinermon v. Burch*, 494 U.S. 113 (1990).

In *Parratt*, a state prison guard negligently destroyed a prisoner's property.  451 U.S. at 529.  The Supreme Court held that, even though it did not provide predeprivation process, the state satisfied due process by providing adequate postdeprivation remedies.  *See id.* at 543.  The Court explained that "either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful [postdeprivation remedy], can satisfy the requirements of procedural due process." *Id.* at 539.  Because the deprivation at issue resulted from "a random and unauthorized act" and not an "established state procedure," the state could not predict precisely when the loss would occur.  *Id.* at 541, 543.  (In fact, the deprivation resulted from the "unauthorized failure . . . to follow established state procedure."  *Id.* at 543.)  In such cases, the Court concluded, "it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation."  *Id.* at 541.  The Court found that the state's postdeprivation remedies "could have fully compensated the [prisoner] for the property loss he suffered" and were sufficient to satisfy due process.  *Id.* at 544.  The Court reaffirmed and cabined *Parratt* in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982), holding that a state's postdeprivation remedies alone will not satisfy due process if the

deprivation resulted from conduct pursuant to an "established state procedure," rather than random and unauthorized conduct. *Id.* at 435–36.

*Hudson* extended *Parratt* to a state prison guard's intentional destruction of a prisoner's property. 468 U.S. at 533. The Court recognized that "[t]he underlying rationale of *Parratt* is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Id.* It explained that "[t]he state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct," rendering predeprivation process for such intentional conduct equally impracticable. *Id.* In this situation, a state may satisfy due process by providing a meaningful postdeprivation remedy. *Id.* Moreover, whether the state employee knew of the deprivation in advance is irrelevant; instead, "[t]he controlling inquiry is solely whether *the state* is in a position to provide for predeprivation process." *Id.* at 534 (emphasis added).

The Court limited *Parratt*'s reach in *Zinermon*. There, state mental hospital staff admitted the plaintiff under a "voluntary" placement statutory procedure even though he was not competent to give the informed consent required by the statute. *See Zinermon*, 494 U.S. at 118–21. The plaintiff argued that the staff members deprived him of liberty without due process when they failed to initiate the statute's involuntary placement procedure. *Id.* at 123–24. The Court held that, unlike in *Parratt* and *Hudson*, the existence of state postdeprivation remedies did not satisfy due process. *Id.* at 139.

The Court cast *Parratt* and *Hudson* as special cases of the well-known due process balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Zinermon*, 494 U.S. at 128–30; *see also Mathews*, 424 U.S. at 335 (weighing the affected private interest, the risk of an erroneous deprivation and probable value of additional procedural safeguards, and the government's interest). In *Parratt* and *Hudson*, "postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide"; "no matter how significant the private interest at stake and the risk of its erroneous deprivation, the State cannot be required constitutionally to do the impossible by providing predeprivation process." *Zinermon*, 494 U.S. at 128, 129 (internal citations omitted).

The Court found *Parratt* and *Hudson* inapplicable in *Zinermon* for "three basic reasons." *Id.* at 136.   First, the *Zinermon* defendants could not claim that the deprivation was unpredictable; any erroneous deprivation would occur "at a specific, predictable point." *Id.*  As the Court explained, "the very nature of mental illness makes it foreseeable that a person needing mental health care" might be willing to sign forms authorizing admission but be incompetent to give informed consent. *Id.* at 133.  Without some threshold determination of competency, such a person might be confined without the procedural safeguards of the involuntary placement process.  *Id.*   In *Parratt* and *Hudson*, however, the state could not anticipate precisely when erroneous deprivations would occur.  *Id.*

Second, the *Zinermon* defendants could not claim that predeprivation process was impossible to provide.  *Id.* at 136.  The state already had an established procedure for involuntary placement, and the admission statutes could have directed hospital staff "to determine whether a person is competent to give consent" before allowing voluntary admission.  *Id.* at 135, 136–37. Had the state so limited and guided the defendants' power to admit patients, the Court reasoned, the deprivation might have been averted.  *Id.* at 137.  But in *Parratt* and *Hudson*, it would be "absurd" to require the state to provide predeprivation process, such as a hearing to determine whether a prison guard should mistakenly or intentionally destroy property.  *Id.*

Third, the *Zinermon* defendants could not characterize their conduct as "unauthorized," as *Parratt* and *Hudson* used that term.  *Id.* at 138.  The Court maintained that "unauthorized" did not mean simply that state law prohibited the action.  *See id.* at 138 & n.20.  Instead, the defendants were "authorized" in a more general sense.  The state delegated both the broad power to deprive liberty *and* the state's accompanying duty to provide adequate procedural protections. *Id.*   In other words, given their "broadly delegated, uncircumscribed power," *id*. at 136, the hospital staff had authority to deprive liberty with or without adequate procedural protections. But in depriving liberty, the staff also had the accompanying duty to provide constitutionally-required procedural safeguards—which could have been provided by initiating the protections for involuntary placement already set up by state law.  The staff members abused their broad authority by failing to initiate those statutory procedures.  *See id.* at 135, 136, 138.  In contrast,

the *Parratt* and *Hudson* state employees had no similar broad authority and no similar duty to initiate the procedural safeguards required before the deprivations occurred. *Id.* at 138.

Ultimately, the Court stated, the *Zinermon* plaintiff's suit was "neither an action challenging the facial adequacy of a State's statutory procedures, nor an action based only on state officials' random and unauthorized violation of state laws." *Id.* at 136. Unlike in *Parratt* and *Hudson*, the deprivation in *Zinermon* was foreseeable and occurred at a predictable point in the admission process, some predeprivation process could be of use in preventing the kind of deprivation alleged, and the deprivation occurred at the hands of the state officials charged with the power to effect the deprivation and the duty to implement procedural safeguards. *Id.* at 138–39. Unlike *Parratt* and *Hudson*, *Zinermon* did not present the "special instance of the *Mathews* due process analysis where postdeprivation process is all that is due." *Id.*

### 2.    *Sixth Circuit precedent under the* Parratt *doctrine*

Our own precedent has grappled with the *Parratt* doctrine. This court often has sought to place procedural due process suits into two categories: "those involving a direct challenge to an established state procedure" and "those challenging random and unauthorized acts." *Mertik v. Blalock*, 983 F.2d 1353, 1365 (6th Cir. 1993) (citing *Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir. 1991)); *see also Warren*, 411 F.3d at 709 ("Under circuit precedent, a § 1983 plaintiff can prevail on a procedural due process claim by demonstrating that the property deprivation resulted from either: (1) an established state procedure that itself violates due process rights, or (2) a 'random and unauthorized' act causing a loss for which available state remedies would not adequately compensate the plaintiff.") (citing *Macene*, 951 F.2d at 706); *Silberstein*, 440 F.3d at 316 (contrasting a deprivation that occurs by an established state procedure with a random and unauthorized deprivation). The *Parratt* doctrine operates only in the second category of cases. *See Warren*, 411 F.3d at 709; *Silberstein*, 440 F.3d at 315 ("The rule requiring a § 1983 plaintiff to show the inadequacy of a state's post-deprivation corrective proceedings . . . applies only where the deprivation complained of is random and unpredictable, such that the state cannot feasibly provide a predeprivation hearing."). A few Sixth Circuit opinions applied the *Parratt* doctrine to a broader set of cases, but these attempts were rebuked. *See Mitchell v. Fankhauser*, 375 F.3d 477, 483–84 (6th Cir. 2004) ("We are therefore faced with deciding between multiple

precedents on both sides—those that apply *Parratt* only to random, unauthorized deprivations of property and those that apply *Parratt* more broadly. Our analysis convinces us that the correct line of authority in the Sixth Circuit is that of [the former].").

This court has wisely noted, however, that not all due process challenges can be easily categorized as a direct challenge to an established state procedure or a challenge to random and unauthorized conduct. *Mertik*, 983 F.2d at 1365. "Specifically, it is not necessarily the case that a due process challenge to state action not involving an 'established state procedure' must automatically come within the *Parratt* and *Hudson* rule governing random and unauthorized acts." *Id.* Where, as here, a plaintiff claims that the conduct at issue was not random and unauthorized but also does not challenge the adequacy of an established state procedure, we undertake a "careful scrutiny" of the three *Zinermon* factors to determine whether the *Parratt* doctrine applies. *Id.* at 1366–67.

Courts may dismiss a procedural due process claim if the state provides an adequate postdeprivation remedy and "(1) the deprivation was unpredictable or 'random'; (2) predeprivation process was impossible or impracticable; and (3) the state actor was not authorized to take the action that deprived the plaintiff of property or liberty." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (per curiam) (citing *Zinermon*, 494 U.S. at 136–39). Our court has explained that, in this analysis, "'unauthorized' means that the official in question did not have the power or authority to effect the deprivation, not that the act was contrary to law." *Warren*, 411 F.3d at 709–10 (citing *Zinermon*, 494 U.S. at 138); *see also Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*, 610 F.3d 340, 354 (6th Cir. 2010) (noting that "violations of state law do not 'automatically translate into a deprivation of procedural due process under the United States Constitution'") (quoting *DePiero v. City of Macedonia*, 180 F.3d 770, 788 (6th Cir. 1999)).

### 3.          Application of the Parratt doctrine

On the specific facts of this case, we find that the *Parratt* doctrine applies and requires Daily Services to plead that Ohio did not provide adequate postdeprivation remedies.  Because Daily Services failed to make such an allegation, the defendants must prevail on their motion for judgment on the pleadings.

Daily Services' complaint explicitly disclaims any challenge to the constitutionality of Ohio's predeprivation procedure statutes.  Nevertheless, relying on *Wedgewood*, 610 F.3d at 355, Daily Services argues that its complaint still challenges an "established state procedure" by alleging that the defendants repeatedly failed to follow Ohio law.  *Wedgewood* does not support this reasoning.  There, the court concluded that a township's enactment of zoning instructions constituted an established state procedure.  *Wedgewood*, 610 F.3d at 355.  Here, there is no legislative action.  Moreover, *Wedgewood* says nothing about how the repeated failure to follow already-enacted state law might constitute an established state procedure.  Contrary to Daily Services' argument, the "established state procedures" in this case are Ohio's statutory and administrative requirements for judgments and liens obtained by the Bureau.

Daily Services also claims that the challenged acts were not random or unauthorized.  We therefore carefully analyze the *Zinermon* factors.  *See Mertik*, 983 F.2d at 1366–67.  All three *Zinermon* factors are present here, so the *Parratt* doctrine applies.

First, the defendants' wrongful deprivations were unpredictable or "random" from the state's perspective.  *See Zinermon*, 494 U.S. at 136.  Daily Services disagrees, arguing that the deprivations were predictable and not random because the defendants repeatedly ignored Ohio's procedures when filing the judgments and liens, and did so intending to shut down Daily Services.  But as the defendants point out, the procedural violations varied.  The Bureau erroneously filed two judgments and two liens without notice, erroneously filed one judgment and one lien before Daily Services' administrative appeal was resolved, and voluntarily released one judgment and two liens.  It would be difficult for the state to predict precisely when these varied, intentional violations of state law would occur.  *Cf. Zinermon*, 484 U.S. at 133, 136 (noting that any erroneous deprivation would occur at a "specific, predictable point").  This is not a case in which the nature of the deprivation process—here, filing judgments and liens by

Bureau employees—renders it foreseeable to the state that its employees would not follow state law. *Cf. id.* at 133 (recognizing that "the very nature of mental illness makes it foreseeable" that an erroneous deprivation of liberty could occur notwithstanding the state procedures). Furthermore, as *Hudson* instructs, that the defendants intended to cause the deprivation does not help Daily Services; the focus of due process is on what the state can anticipate. *See* 468 U.S. at 533–34. Nevertheless, we specifically leave open the question whether repeated violations of the same or similar predeprivation state procedural rights over a period of time could be considered "unpredictable," even from the state's point of view.

Second, predeprivation process was impracticable here. *See Zinermon*, 494 U.S. at 136–37. Daily Services argues that Ohio already has procedures that provide predeprivation process, thereby proving its practicality. This point is persuasive but carries the argument only halfway to the goal line. The *Zinermon* Court identified a procedure *in addition to those already in place* that the state could have implemented to avert the erroneous deprivation. *See id.* at 135–37 (noting that the statutes could have provided additional predeprivation process by directing hospital staff "to determine whether a person is competent to give consent" before allowing voluntary admission). To the question what more the Due Process Clause expected of the state, the additional procedure supplied the answer. But Daily Services does not identify any additional, practical procedures Ohio could implement to thwart the wrongful filing of judgments and liens. In fact, Daily Services' complaint suggests that the defendants, "like the prison guard in *Hudson*, were bent upon effecting the substantive deprivation and would have done so despite any and all predeprivation safeguards." *Id.* at 137. Considered from another angle, Ohio's current procedures do not protect against the specific risk in this case: that Bureau employees will intentionally disregard the predeprivation safeguards already in place. Additional procedures to protect against *this* risk are impractical to provide. *See Hudson*, 468 U.S. at 533; *cf. Zinermon*, 484 U.S. at 135; *Powell*, 114 F.3d at 1082 (denying the plaintiff's claim in part because "the Protocol already provides predeprivation procedures for caseworkers to follow," and "[t]here is no other feasible predeprivation procedure that is readily apparent to us").

Third, the defendants were not "authorized" to take the actions that deprived Daily Services of its property. *See Zinermon*, 494 U.S. at 138. Actions that merely violate state law

might still be "authorized" under the *Parratt* analysis. *Warren*, 411 F.3d at 709–10; *see Zinermon*, 494 U.S. at 138 & n.20. "Unauthorized" actions, in contrast, occur when the official in question lacks the broad power or authority to effect the deprivation. *Warren*, 411 F.3d at 709–10. Here, this factor presents a close call. Nevertheless, we think that, although the state has delegated the defendants the power to deprive property by filing judgments and liens, *see, e.g.*, Ohio Rev. Code Ann. § 4123.37, such power is not "broadly delegated" or "uncircumscribed" as *Zinermon* used those terms, *see* 494 U.S. at 138. The power is circumscribed by Ohio's detailed statutory and administrative requirements.

Daily Services argues that the defendants' actions were "authorized" because they were taken by high-ranking officials who abused their positions. But we need not resolve whether acts by certain high-ranking officials should never be considered "random and unauthorized," as the Second Circuit has held. *See Rivera-Powell v. N.Y. City Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006). *But see San Gerónimo*, 687 F.3d at 493–94 (1st Cir.) (rejecting that proposition); *Johnson v. La. Dep't of Agric.*, 18 F.3d 318, 322 (5th Cir. 1994) (same); *Easter House v. Felder*, 910 F.2d 1387, 1400 (7th Cir. 1990) (en banc) (same). Regardless of their positions, the defendants were not authorized to effect deprivations in the way the *Zinermon* defendants were.

In light of the three *Zinermon* factors, "postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide." *Zinermon*, 494 U.S. at 128. The *Parratt* doctrine therefore applies, and Daily Services' procedural due process claims fail if Ohio provides an adequate postdeprivation remedy. *Copeland*, 57 F.3d at 479. Daily Services' complaint does not allege that Ohio's postdeprivation remedies are inadequate. Moreover, "[a]lthough the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process." *Parratt*, 451 U.S. at 544. In other words, Daily Services must explain why the ability to be heard in state court and to vacate the wrongful judgment and liens, even in the absence of damages, is insufficient to remedy the defendants' process violations. A convincing argument on this point might exist, but Daily Services has not offered it. Thus, under *Parratt*, Daily Services' complaint does not state a claim for a procedural due process violation.

### **III.  CONCLUSION**

The district court erred when it held that uncertainty about the applicability of *Parratt* entitled the defendants to qualified immunity.  Nevertheless, because the *Parratt* doctrine does apply, and Daily Services has not pleaded that Ohio provided inadequate postdeprivation remedies, Daily Services' complaint does not state a constitutional violation.  Accordingly, we affirm the district court's decision granting the defendants' motion for judgment on the pleadings.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. I agree entirely with the majority's well-written and well-reasoned explanation of the relationship between the *Parratt* and qualified-immunity doctrines. However, I cannot concur in the majority's ultimate conclusion that the *Parratt* doctrine applies in this case, because I do not believe that the defendants' actions were "unauthorized" as defined by the Supreme Court in *Zinermon v. Burch*, 494 U.S. 113, 138 (1990). As a result, I must respectfully dissent from Part II.C.3 of the lead opinion.

In *Zinermon*, "[t]he State delegated to [the defendants] the power and authority to effect the very deprivation complained of . . . , and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful confinement." *Id.* The Court distinguished that case from *Parratt v. Taylor*, 451 U.S. 527 (1981), and *Hudson v. Palmer*, 468 U.S. 517 (1984), by noting that the state employees in those cases "had no similar broad authority to deprive prisoners of their personal property, and no similar duty to initiate (for persons unable to protect their own interests) the procedural safeguards required before deprivations occur." *Zinermon*, 494 U.S. at 138. Thus, the Court concluded that "[t]he deprivation [in *Zinermon* was] 'unauthorized' only in the sense that it was not an act sanctioned by state law, but, instead, was a 'depriv[ation] of constitutional rights . . . by an official's abuse of his position.'" *Id.* (quoting *Monroe v. Pape*, 365 U.S. 167, 172 (1961)) (third alteration and ellipsis in original). As a result, *Zinermon* allowed the plaintiff's due-process claim, which focused on the denial of predeprivation process, to go forward.

The case here is similar to *Zinermon*. Section 4123.37 of the Ohio Revised Code grants the Bureau power to present the Court of Common Pleas clerk with the Bureau's assessment of premiums in arrears and to cause a judgment to be entered against the noncompliant employer. Ohio law also imposes upon the Bureau, and its employees, the responsibility to follow the procedural safeguards set forth in § 4123.37 to protect the due-process rights of the noncompliant employers. The fact that the defendants failed to follow the state-mandated

procedures does not mean that they were not legally empowered to effect those deprivations.  As a result, I would hold that the defendants' actions were authorized and, therefore, that the *Parratt* doctrine does not apply.  Plaintiff should be able to proceed on its claim based on a denial of predeprivation process, and defendants' motion for judgment on the pleadings should be denied. Because the majority sees this close question differently, I must respectfully dissent.